SAN ANTONIO FIRE & POLICE PENSION FUND, on behalf of itself and all other similarly situated, Plaintiff,

v.

AMYLIN PHARMACEUTICALS, INC., Bank of America, N.A., Bank of New York Trust Company, N.A., Daniel M. Bradbury, Joseph C. Cook, Jr., Adrian Adams, Steven R. Altman, Teresa Beck, Karin Eastham, James R. Gavin, Ginger L. Graham, Howard E. Greene, Jr., Jay S. Skyler, Joseph P. Sullivan, and James N. Wilson, Defendants.

Amylin Pharmaceuticals, Inc., Cross–Claimant,

v.

The Bank of New York Trust Company, N.A., as Trustee for Indenture dated as of June 8, 2007, Cross–Claim Defendant.

C.A. No. 4446–VCL.

Court of Chancery of Delaware.

Submitted: May 4, 2009.

Decided: May 12, 2009.

Andre C. Bouchard, Esquire, Joel Friedlander, Esquire, Bouchard Margules & Friedlander, P.A., Wilmington, Delaware, J. Travis Laster, Esquire, T. Brad Davey, Esquire, Abrams & Laster LLP, Wilmington, Delaware; Mark Lebovitch, Esquire, Samuel J. Lieberman, Esquire, Amy Miller, Esquire, Bernstein Litowitz Berger & Grossmann LLP, New York, New York; Frank Burney, Esquire, Martin & Drought, P.C., San Antonio, Texas, Attorneys for the Plaintiff.

Raymond J. DiCamillo, Esquire, Margot F. Alicks, Esquire, Richards Layton & Finger, P.A., Wilmington, Delaware; Thad J. Bracegirdle, Esquire, Wilks Lukoff & Bracegirdle, LLC, Wilmington, Delaware; Richard H. Morse, Esquire, Elena C. Norman, Esquire, Emily V. Burton, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Peter B. Ladig, Esquire, Scott G. Wilcox, Esquire, Stephen B. Brauerman, Esquire, Bayard P.A., Wilmington, Delaware; Robert A. Sacks, Esquire, Diane L. McGimsey, Esquire, Orly Z. Elson, Esquire, Damion D.D. Robinson, Esquire, Sullivan & Cromwell LLP, Los Angeles, California, Attorneys for the Defendants, Cross–Claimant, and Cross–Claim Defendant.

## OPINION

LAMB, Vice Chancellor.

The principal issue addressed in this opinion is whether a commonplace provision found in a trust indenture governing publicly traded notes prevents the issuer's board of directors from "approving" as "continuing directors" persons nominated by stockholders in opposition to the slate nominated by the incumbent directors. Both the corporation and its stockholders take the position that it does not and that, instead, the board of directors has the power to give its approval to any nominee, whether or not nominated by the incumbent directors. The indenture trustee takes the opposite position, arguing that the incumbent directors cannot "approve" as a "continuing director" any person whose election the incumbent directors publicly oppose. The issue is consequential because if a majority of the board at any time are not "continuing directors," holders of the notes gain the right to put their notes to the corporation at face value. Because the notes are trading on a deeply discounted basis, any event threatening to trigger this provision poses a substantial economic problem for the corporation and its stockholders.

Noting that provisions of this kind can operate as improper entrenchment devices that coerce stockholders into voting only for persons approved by the incumbent board to serve as continuing directors, the court holds that the indenture provision cannot be read as narrowly as urged by the indenture trustee. Instead, construed in accordance with generally applied standards, the provision is properly understood to permit the incumbent directors to approve as a continuing director any person, whether nominated by the board or a stockholder, as long as the directors take such action in conformity with the implied covenant of good faith and fair dealing and in accordance with their normal fiduciary duties.

## I.

### A. The Parties

Plaintiff San Antonio Fire & Police Pension Fund is a public pension fund for police officers and firefighters in the city of San Antonio, Texas. The plaintiff is, and has been at all relevant times, a record and/or beneficial owner of Amylin common stock.

Defendant Amylin Pharmaceuticals, Inc. is a publicly traded Delaware corporation with its principal place of business in San Diego, California. Amylin is a biopharmaceutical company engaged in the discovery, development, and commercialization of drug candidates for the treatment of diabetes, obesity, and other diseases.

The individual defendants are all of the directors of Amylin.

Defendant Bank of America, N.A. ("BANA") is the Administrative Agent for Amylin's senior secured credit agreement dated December 21, 2007 (the "Credit Agreement"), and is also the Collateral Agent, L/C Issuer,[1] and a lender thereunder.

Defendant The Bank of New York Mellon Trust Company, N.A. (formerly, The Bank of New York Trust Company, N.A.) is the "Trustee" under the trust indenture dated June 8, 2007 (the "Indenture") for Amylin's 3.00% convertible senior notes due 2014 (the "2007 Notes").

### B. Facts

Because there are no issues of material fact, the following is drawn mainly from the statement of undisputed facts contained in the Joint Pretrial Stipulation and Order filed May 1, 2009.

#### 1. The History Of The Debt Instruments

At a meeting on or about May 22, 2007, Amylin's board adopted resolutions authorizing certain members of the company's senior management to negotiate the terms and conditions of the 2007 Notes. The board also designated the Finance Committee of the Amylin board as the "Pricing Committee" for the 2007 Notes, and delegated full board authority to the Pricing Committee to negotiate and issue the 2007 Notes. The Pricing Committee ultimately approved the issuance of the 2007 Notes.

This lawsuit arises out of a change of control covenant in the Indenture for the 2007 Notes. Section 11.01 of the Indenture gives the noteholders the right to demand redemption of any or all of their notes at face value upon the occurrence of certain events, including a Fundamental Change, as defined in the Indenture.[2] A "Fundamental Change" is defined in Sec-

---

1. As L/C Issuer, BANA is responsible for issuing letters of credit under the letter of credit facility included as part of the Credit Agreement.

2. *See* Fourth Am. Compl. Ex. A (hereinafter "Indenture") § 11.01.

tion 1.01 of the Indenture to have occurred if, *inter alia,* "at any time the Continuing Directors do not constitute a majority of the Company's Board of Directors...." The Indenture defines "Continuing Directors" as:

(i) individuals who on the Issue Date constituted the Board of Directors and (ii) any new directors whose election to the Board of Directors or whose nomination for election by the stockholders of the Company was approved by at least a majority of the directors then still in office (or a duly constituted committee thereof) either who were directors on the Issue Date or whose election or nomination for election was previously so approved.[3]

At present, the Amylin board consists of 12 persons, each of whom is a Continuing Director.

The drafting history of the Indenture reveals little regarding the parties' intentions surrounding the Continuing Directors provision. On June 1, 2007, counsel for Goldman Sachs and Morgan Stanley, the lead underwriters in the offering of the 2007 Notes, circulated a first draft of the description of the notes, which included a Continuing Directors provision. Amylin's outside counsel, Cooley Godward, circulated a markup of the draft description of the notes the next day. The markup did not contain any proposed change of the Continuing Directors provision. On June 5, 2007, the underwriters' counsel sent Cooley Godward an initial draft of the Indenture. The initial draft of the Indenture contained a Continuing Directors provision substantially the same as the one contained in the draft description of the notes. The final version of the Continuing Directors provision is unchanged from that contained in the initial draft Indenture.

Before authorizing the issuance of the 2007 Notes, the Pricing Committee discussed certain terms of the notes with the company's outside counsel. During the course of that discussion, the Continuing Directors provision was neither brought to the attention of, nor discussed by, the Amylin directors.[4]

Amylin's senior secured credit facility also contains a form of continuing director provision, the history of which is useful in considering the parallel provision in the Indenture. In July 2006, almost a year before the 2007 Notes were issued, the Finance Committee authorized the officers of Amylin to enter into a senior secured debt facility of up to $100 million on terms and conditions as those officers determined to be necessary and appropriate. In November 2006, the Finance Committee increased its authorization for the credit facility to $125 million. Almost a year later, in October 2007, Amylin signed a term sheet for a $105 million credit facility and $15 million revolving line of credit. On December 21, 2007, Amylin entered into

---

3. Indenture § 1.01.

4. The Pricing Committee engaged in extensive discussions with its legal advisors, management, and underwriters with regard to the best way to structure the notes. Once the final terms had been negotiated, the Pricing Committee asked its outside counsel, whom, with input from Amylin management and internal counsel, had acted as agents for the company in the process of negotiating the terms of the Indenture with the underwriters, whether the notes were subject to any terms which counsel saw as "unusual or not customary." Bradbury Dep. Tr. 77. Amylin's outside counsel responded that there were not. The Pricing Committee then authorized the issuance and sale of the notes. Amylin's officers and its outside counsel were of the opinion at the time that the financial terms of the offering were very favorable to the company.

the definitive senior secured Credit Agreement with BANA, providing for a $125 million term credit facility and a $15 million revolving credit facility.

The Continuing Directors provision in the Credit Agreement is more explicitly confining than the one in the Indenture. Under the Credit Agreement, the occurrence of a Change of Control constitutes an Event of Default which, if not waived, would have the effect of accelerating the debt due under the agreement.[5] A Change of Control is defined in the Credit Agreement as including:

> an event or series of events by which . . . (b) during any period of 24 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Company cease to be composed of individuals
>
> (i) who were members of that board or equivalent governing body on the first day of such period,
>
> (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body, or
>
> (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of

> proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors).[6]

This Change of Control definition was the subject of some negotiation between counsel for BANA and counsel for Amylin. Amylin's counsel suggested that the language of the Credit Agreement defining Change of Control be changed to conform to the definition in the Indenture. BANA's counsel rejected that suggestion, instead insisting on the form found in Bank of America's Model Syndicated Credit Agreement. It is that model clause, as set forth above, that appears in the final Credit Agreement.

### 2. The Proxy Contest

On January 28, 2009, Icahn Partners LP and affiliates ("Icahn"), an approximately 8.8% stockholder, notified Amylin of its intention to nominate a slate of five directors to Amylin's 12–person board. The next day, Eastbourne Capital Management, L.L.C., a 12.5% stockholder, notified Amylin of its intention to nominate its own five-person slate. On February 1, 2009, Eastbourne sent a letter asking the Amylin board to take action to prevent the adverse consequences that would befall the corporation if the Continuing Directors provision of the Indenture were triggered. Specifically, Eastbourne asked the board to assemble an approved slate of directors that included a significant number of the nominees from each of Eastbourne's and Icahn's slates.

On February 27, 2009, Amylin filed its annual report on Form 10–K for the year ended December 31, 2008. In its Form

---

5. *See* Fourth Am. Compl. Ex. B [hereinafter "Credit Agreement"] §§ 8.01(k), 8.02.

6. *Id.* at § 1.01.

10–K, Amylin highlighted the potential adverse consequences if the Continuing Directors provisions of its outstanding debt instruments were triggered.[7]

On March 9, 2009, Eastbourne sent a letter to the Amylin board questioning the legitimacy of the Continuing Directors provisions of the Indenture and the Credit Agreement and calling upon the board to use its power to remove any obstacle to the operation of the stockholder franchise, including "approving" the dissident slates for purposes of the 2007 Notes and obtaining any necessary consents or waivers from the lenders under the Credit Agreement.

On March 17, 2009, Amylin stated publicly that the tentative date for its 2009 annual meeting was May 27, 2009.

## C. *The Litigation*

On March 24, 2009, the plaintiff filed its original purported class action complaint against Amylin and its individual directors. That complaint alleged (1) breaches of the fiduciary duties of care and loyalty by the board of Amylin in the adoption of the Credit Agreement and the Indenture, insofar as they both contained Continuing Directors provisions, (2) breaches of the fiduciary duties of care and loyalty by Amylin's board in failing to approve the dissident nominees in order to defuse the Continuing Directors provision of the Indenture, and (3) breaches of the fiduciary duties of care and loyalty in the allegedly misleading and coercive manner in which Amylin's board chose to disclose the risks presented by the Continuing Directors provisions in the company's Form 10–K. The relief requested was in the form of declaratory and injunctive relief. Specifically, the plaintiff sought declarations that the directors had breached their fiduciary duties and that the Continuing Directors provisions were unenforceable. The plaintiff also sought a mandatory injunction requiring the directors to approve the stockholder nominees. After a telephonic hearing, the court ordered expedited proceedings.[8]

7. Amylin stated in its annual report:
   If as a result of this potential proxy contest a majority of our Board of Directors ceases to be composed of the existing directors or other individuals approved by a majority of the existing directors, then a "change of control" under the Term Loan and a "fundamental change" under the indenture for 2007 Notes will be triggered. If triggered, the lenders under the Term Loan may terminate their commitments and accelerate our outstanding debt and the holders of our 2007 Notes may require us to repurchase the notes. We may not have the liquidity or financial resources to do so at the times required or at all.

   * * *

   If a proxy contest results from one or both notices received from the Icahn Group or Eastbourne announcing their intent to each nominate five individuals for election to our Board of Directors at the 2009 annual meeting . . . our business could be adversely affected because . . . if a majority of our Board of Directors ceases to be composed of the existing directors or other individuals approved by a majority of the existing directors, we may be required to repay $575 million under our 2007 Notes, $125 million under our Term Loan and any amounts that may be outstanding under our $15 million revolving credit facility, and if a cross-default is triggered, $200 million under our 2004 Notes. . . .

   (Amylin Pharmaceuticals, Inc., Annual Report (Form 10–K), at 37, 39–40 (Feb. 27, 2009)).

   Thus, if the Continuing Directors provisions of both the Credit Agreement and the 2007 Notes were triggered, and the 2004 Notes cross-defaulted as a result, the company would be required to immediately pay back as much as $915 million. As of December 31, 2008, Amylin had approximately $817 million in cash, cash equivalents, and short term investments. *Id.* at 59.

8. On March 26, 2009, the plaintiff filed a motion for expedited proceedings. On March 27, 2009, the plaintiff filed an amended complaint adding a count alleging that the di-

On March 30, 2009, Amylin filed its preliminary proxy statement, stating its belief that the board possesses the contractual right under the Indenture to approve the stockholder nominees "at any time up to the election." [9]  On April 2, 2009, Amylin released a proxy "fight letter," stating:

> While we believe that the Board has the ability to approve any nominees proposed by Icahn or Eastbourne at any time up to the election in order to nullify the debt acceleration provision, we cannot ensure that our bondholders will concur with that view.  In fact, we requested confirmation of our view from the trustee of the 2014 notes and the trustee has refused to confirm our view.  To protect the company and its shareholders, this issue will need to be resolved in court.[10]

Early in April, the plaintiff filed second and third amended complaints, adding BANA and the Trustee as necessary defendants.  The third amended complaint also added a new count seeking a declaration that Amylin's board has the sole right and power to approve the stockholder nominees for the purpose of the Continuing Directors provision of the Indenture.

On April 7, 2009, the individual defendants and Amylin filed their answer.  That answer contains a cross-claim by Amylin against the Trustee, seeking declaratory relief that the board has the right under the Indenture to approve the election of any or all of the stockholder nominees at any time up to their election.  The plaintiff then moved for partial summary judgment that the Continuing Directors provision of the Credit Agreement is unenforceable as a matter of law and that the board has the right and power to approve the stockholder nominees for the purpose of the Indenture.

## D.  *The Partial Settlement*

On April 13, 2009, the plaintiff and Amylin announced that they had entered into a partial settlement.  Under the terms of the settlement, the plaintiff agreed to amend its complaint to remove any allegations of breaches of the duty of loyalty (or allegations of lack of good faith by the board), agreed not to seek damages against Amylin or the board, and agreed to dismiss without prejudice its claim against the board relating to the allegedly coercive disclosure in the company's Form 10–K.  The plaintiff also agreed to dismiss its claim against the board for breach of fiduciary duty in failing to act to approve the stockholder nominees and drop its related demand for injunctive relief.  In exchange for dropping this claim, the board issued a public statement that:

> the Board has determined, subject only to the entry of a final, non-appealable order prior to May 27, 2009 declaring that the Board possesses the contractual

---

rectors violated Section 141(a) of the Delaware General Corporation Law in adopting the Continuing Directors provision in the Credit Agreement, and that such allegedly *ultra vires* act renders the provision unenforceable as a matter of law.

**9.**  Amylin stated: "The Company believes that its current Board of Directors has the ability to approve any nominees proposed for election by Icahn or Eastbourne at any time up to the election and avoid the occurrence of a 'fundamental change' under the indenture for the [2007 Notes] in the event six or more of

those nominees are ultimately elected.  However, approval of those nominees by the current Board of Directors cannot avoid the occurrence of a 'change of control' under the credit agreement in the event six or more of them are elected."  Amylin Pharmaceuticals, Inc., Preliminary Proxy Statement (Schedule 14A), at 18 (Mar. 30, 2009).

**10.**  Amylin Pharmaceuticals, Inc., Proxy Solicitation Materials (Form DEFA14A), Ex 99.1 at 2 (Apr. 2, 2009).

right to do so, that the Board will "approve" the Icahn Capital LP and Eastbourne Capital Management L.L.C. nominees for [the purpose of the Continuing Directors provision of the Indenture].[11]

That same day, Amylin moved for partial summary judgment on its cross-claim against the Trustee.

On April 16, 2009, the plaintiff filed its fourth amended complaint implementing the terms of the partial settlement between the plaintiff and Amylin. On April 23, 2009, BANA filed its answering brief with respect to the plaintiff's motion for partial summary judgment and made its own cross-motion for summary judgment with respect to the claims against it.

### E. *The Claims Against BANA Are Mooted*

During the pretrial conference on May 1, 2009, counsel for Amylin, together with counsel for BANA, informed the court that the parties were close to reaching an agreement on a consent and waiver under the Credit Agreement which would moot the related claims. The court thus agreed, with the consent of the parties, to hold the claims arising out of the Credit Agreement in abeyance for the purposes of the May 4 trial. Later that day, Amylin and BANA entered into a consent and waiver agreement (the "BANA Consent Agreement")

as anticipated. Under the BANA Consent Agreement, the lenders would agree to waive any event of default resulting from the 2009 Amylin director elections triggering the Continuing Directors provision of the Credit Agreement.[12] In exchange, Amylin agreed to pay a 50 basis point fee on any outstanding balance under the Credit Agreement to the lenders, should the Continuing Directors provision be triggered by the 2009 director elections.[13]

The resolution with BANA did not affect the claims relating to the Indenture. Thus, on May 4, 2009, trial was held and oral arguments were heard on all outstanding motions for summary judgment regarding the Indenture, and all outstanding claims relating to the Indenture were submitted to the court for final adjudication on the record.[14]

### F. *Post-trial Changes In The Proxy Contest*

On May 6, 2009, two days after the close of the record, the court received a letter from counsel for Amylin, setting forth recent developments in the plans of the insurgent parties. On May 4, 2009, Eastbourne filed its definitive proxy statement, in which it reduced the number of candidates it was nominating to the Amylin board from five to three.[15] On May 6,

---

11. Amylin Pharmaceuticals, Inc., Current Report (Form 8–K), at 2 (Apr. 15, 2009).

12. The lenders' consent is conditioned on the delivery to BANA of a copy of one of the following, providing that the election of any or all of the stockholder nominees will not result in a Fundamental Change under the Indenture: (1) a final judgment by a court of competent jurisdiction, (2) a settlement agreement approved by the court, or (3) an opinion of counsel to the Trustee.

13. Amylin also agreed to pay a 25 basis point fee to BANA for attempting to solicit the consent to the BANA Consent Agreement of the

required percentage of the lenders under the Credit Agreement (the "Required Lenders").

14. On May 6, 2009, BANA notified the court that the Required Lenders consented to the BANA Consent Agreement. Count II of the fourth amended complaint, which seeks a declaration of the invalidity and unenforceability of the Continuing Directors provision of the Credit Agreement, has thus been rendered moot.

15. Amylin Pharmaceuticals, Inc., Definitive Proxy Statement of Eastbourne Capital Management, L.L.C. et al. (Form DEFC14A), at 1–4 (May 4, 2009).

2009, Icahn filed its definitive proxy statement, in which it reduced the number of candidates it was nominating to the Amylin board from five to two.[16] As a consequence of these changes, no more than five stockholder-nominated directors will be elected to the 12 member Amylin board at the 2009 annual stockholder meeting. The Trustee has, in response, renewed its objection to proceeding at this point, on the basis that the issues are not ripe for determination. The plaintiff and Amylin both respond that the court should proceed because, if elected, whether or not the stockholder-nominated directors constitute Continuing Directors may have a significant effect on next year's annual stockholder meeting.

## II.

The Amylin board has already agreed to approve the dissident slates if this court determines that it is entitled to do so. Thus, the central issue in this case is whether or not the Amylin board has both the power and the right under the Indenture to approve the stockholder nominees.

■■■ Because the Indenture constitutes a contract between Amylin and the Trustee, determination of this question is one of contract interpretation.[17] Interpretation of the Indenture is controlled by New York law pursuant to a choice of law provision contained therein.[18] "Under New York law, as in Delaware, the construction and interpretation of an unambiguous written contract is an issue of law within the province of the court."[19] "Included in this initial interpretation is the threshold question of whether the terms of the contract are ambiguous."[20] "Contractual language whose meaning is otherwise plain is not ambiguous merely because the parties urge different interpretations in the litigation."[21] "Contract language is unambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'"[22] "Where the [contract's] language is free from ambiguity, its meaning may be determined as a matter of law on the basis of the writing alone without resort to extrinsic evidence."[23]

■■■ "In interpreting contract language, New York contract law instructs courts ordinarily to give the words and phrases employed their plain and common-

16. Amylin Pharmaceuticals, Inc., Definitive Proxy Statement of Carl C. Icahn et al. (Form DEFC14A), at 2 (May 6, 2009).

17. See Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir.1982) (stating that under New York law "[i]nterpretation of indenture provisions is a matter of basic contract law").

18. See Indenture § 1.12.

19. Law Debenture Trust Co. v. Petrohawk Energy Corp., 2007 WL 2248150, at *5 (Del.Ch.), aff'd mem., 947 A.2d 1121 (Del.2008); see also K. Bell & Assocs., Inc. v. Lloyd's Underwriters, 97 F.3d 632, 637 (2d Cir.1996).

20. Alexander & Alexander Servs. v. These Certain Underwriters at Lloyd's, London, 136 F.3d 82, 86 (2d Cir.1998).

21. First Lincoln Holdings, Inc. v. Equitable Life Assurance Soc'y, 164 F.Supp.2d 383, 393 (S.D.N.Y.2001) (citing U.S. Trust Co. of New York v. Jenner, 168 F.3d 630, 632 (2d Cir. 1999)).

22. Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir.1990) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280 (1978)).

23. Master–Built Constr. Co. v. Thorne, 22 A.D.3d 535, 802 N.Y.S.2d 713, 714 (App.Div. 2005).

ly-accepted meanings."[24] Thus:

> The parties' rights under an unambiguous contract should be fathomed from the terms expressed in the instrument itself rather than from extrinsic evidence as to terms that were not expressed or judicial views as to what terms might be preferable. In its efforts to preserve the parties' rights and the status quo, the court must be careful not to alter the terms of the agreement. The parties having agreed upon their own terms and conditions, "the courts cannot change them and must not permit them to be violated or disregarded."[25]

Moreover, when interpreting quasi-standardized contracts such as indentures, "[b]oilerplate provisions are ... not the consequence of the relationship of particular borrowers and lenders and do not depend upon particularized intentions of the parties to an indenture."[26] Finally, "[i]ndentures are to be read strictly and to the extent they do not expressly restrict the rights of the issuer, the issuer is left with the freedom to act, subject only to the boundaries of other positive law."[27]

### A.  The Power To Approve

■■■ The Trustee contends that, for the purpose of the Continuing Directors provision of the Indenture, that the word "approve" is synonymous with "endorse or recommend." The Trustee argues:

> [t]he Board's determination not to recommend the election of any of the Dissident Nominees, to recommend its own competing slate, and that the election of

the Dissident Nominees would not be in the best interests of the Company—determinations that have not changed as a result of the Partial Settlement—simply cannot be reconciled with the plain meaning of the term "approval." To the contrary, such determinations by the Board clearly indicate *disapproval*.[28]

As the Trustee would have the court read the Indenture, then, the board could never approve a stockholder-nominated slate for the purposes of the Indenture and yet, simultaneously, run its own slate in opposition.

In contrast, cross-claim plaintiff Amylin contends, citing *Black's Law Dictionary*, that "to approve" means "to give formal sanction to; to confirm authoritatively."[29] Thus, Amylin argues, while endorsement or recommendation may necessarily imply approval, the reverse is not true. By Amylin's reading, therefore, the board may approve a slate of nominees for the purposes of the Indenture (thus sanctioning their nomination for election) without endorsing them, and may simultaneously recommend and endorse its own slate instead.

Amylin's reading of the Indenture is the correct one. To read the provision as the Trustee suggests would mean that any election of stockholder nominees resulting from a contested election, even over insubstantial matters, would bar the board from approving the dissident slate for the purposes of the Indenture. Unlike the Credit Agreement with its two-year sliding-window lookback, under the Indenture a non-

---

24. *Petrohawk*, 2007 WL 2248150, at *6; *accord Laba v. Carey*, 29 N.Y.2d 302, 327 N.Y.S.2d 613, 277 N.E.2d 641, 644 (1971).

25. *Metro Life Ins.*, 906 F.2d at 889 (some internal citations and quotations omitted) (quoting *Whiteside v. N. Am. Accident Ins. Co.*, 200 N.Y. 320, 93 N.E. 948, 950 (N.Y. 1911)).

26. *Sharon Steel*, 691 F.2d at 1048.

27. *In re Loral Space & Commc'ns Inc. Consol. Litig.*, 2008 WL 4293781, at *35 (Del.Ch.).

28. Trustee's Br. in Opp'n to Pl.'s and Amylin's Mot. for Summ. J. 31–32 (emphasis in original).

29. BLACK'S LAW DICTIONARY 111 (8th ed.2004).

Continuing Director remains so for the life of the notes. The Trustee's reading would therefore render the Continuing Directors provision of the Indenture, as a possible entrenchment mechanism, to be far more restrictive than the parallel provision in the Credit Agreement. This would be a surprising result given the facially more restrictive language in the Credit Agreement.[30] Read that way, the Indenture would prohibit *any* change in the majority of the board as a result of any number of contested elections, for the entire life of the notes.

A provision in an indenture with such an eviscerating effect on the stockholder franchise would raise grave concerns. In the first instance, those concerns would relate to the exercise of the board's fiduciary duties in agreeing to such a provision. The court would want, at a minimum, to see evidence that the board believed in good faith that, in accepting such a provision, it was obtaining in return extraordinarily valuable economic benefits for the corporation that would not otherwise be available to it.[31] Additionally, the court would have to closely consider the degree

to which such a provision might be unenforceable as against public policy.[32]

## B. *The Right To Approve*

Having determined that the board has, in the abstract, the power to approve a stockholder-nominated slate and still engage in a proxy contest against that slate, the court now turns to the question of whether the Amylin board has properly exercised the *right* to do so in this case. The key question is whether approval by the board, under the given circumstances, comports with the company's implied duty of good faith and fair dealing which inheres in all contracts, including the Indenture.

This court considered the contours of that duty in a similar context in *Hills Stores Company v. Bozic.*[33] In that case, the board of directors of Hills Stores Company entered into an employment agreement with three of its executives, which agreement included the right to a significant severance payment should there be a change in control of the board not approved by the pre-existing board for the purposes of the agreement. A dissident stockholder ultimately took control of the board in a proxy contest with promises of

---

**30.** In light of the fact that when Amylin's outside counsel attempted to convince BANA, during the negotiation of the Credit Agreement, to replace BANA's own model Continuing Directors provision with the one from the Indenture, BANA refused and insisted on its own provision, it seems reasonable to conclude that BANA, as an objective third party, read the Indenture provision to be less restrictive than its own model covenant and desired the greater restriction its own model provision provided. Such restrictive provisions are somewhat less concerning in syndicated lending agreements than they are in public debt instruments because of the relative ease with which consents or waivers are obtained in bank lending than in public debt instruments. Witness the consent and waiver agreement obtained from BANA and the Required Lenders on May 6, compared to the

understandable lack of any attempt by Amylin to obtain an amendment from the noteholders.

**31.** This is arguably a lesser burden than would be applied if the record showed that the board had specifically included such a provision for the primary purpose of interfering with or frustrating the stockholder franchise. *See Blasius Indus., Inc. v. Atlas Corp.,* 564 A.2d 651, 659–60, 662 (Del.Ch.1988).

**32.** A provision so strongly in derogation of the stockholders' franchise rights would likely put the trustee and noteholders on constructive notice of the possibility of its ultimate unenforceability.

**33.** 769 A.2d 88 (Del.Ch.2000).

a rich sale transaction.[34] The Hills Stores board, over the dissident's protests, refused to approve the change in control, and the executives resigned and took their severance payments. The dissident, now in control of Hills Stores, then caused the company to sue the former directors for allegedly breaching their duty of loyalty by failing to approve the change in control.

▮ The *Hills Stores* court, in considering whether the board was justified in not approving the change in control, recognized that the measure of whether the approval was in good faith was whether the board believed that the dissident slate posed a danger to the interests of the corporation and its stockholders.[35] The court stated:

> [T]he board's decision ... to take a consistent approach to the issue of whether to approve the Dickstein Change in Control was a reasonable response in the circumstances presented. Because the board had determined, for many sufficient reasons, that the Dickstein Change in Control was harmful to the company,

it would have exercised bad faith under the Employment Agreements *if it had* voted to approve the Change in Control simply so as to avoid triggering the Covered Executives' right to severance.[36]

The underlying rule is the same here. Thus, the board may approve the stockholder nominees if the board determines in good faith that the election of one or more of the dissident nominees would not be materially adverse to the interests of the corporation or its stockholders.[37]

▮ The application of this rule here is problematic.[38] The court has been presented with no evidence regarding the board's deliberation with respect to the decision to approve the stockholder-nominated slate. No party has placed into the record any board minutes, resolutions, or other evidence that would indicate how the board came to its decision. Rather, before the court are two less than helpful sets of circumstances.

First are the negative public statements made by the board in various fight letters with respect to the dissident nominees.[39]

---

34. The board, in considering the dissident's offer the financing for which was uncommitted, had earlier determined that the dissident's offer and a change in control in his favor represented a threat to the corporation and its stockholders. *Id.* at 108.

35. *Id.* at 108–09.

36. *Id.*

37. In other words, if passing control would not constitute a breach of the directors' duty of loyalty to the corporation and its stockholders. It is important to recognize here that the directors are under absolutely *no* obligation to consider the interests of the noteholders in making this determination.

38. Because Amylin seeks a declaratory judgment as to its right to approve, it bears the burden of proof here. *See Those Certain Underwriters at Lloyd's, London v. Nat'l Installment Ins. Servs., Inc.,* 2007 WL 4554453 (Del. Ch.).

39. *See, e.g.,* Amylin Pharmaceuticals, Inc., Additional Definitive Proxy Solicitation Material (Form DEFA14A), at 3 (Apr. 24, 2009). The board stated:

> Over the course of our conversations with Mr. Icahn and Eastbourne, it has become abundantly clear that their goal is the sale of Amylin. We strongly believe that this agenda is not in the best interests of Amylin's shareholders. Your Board and management believe that a sale of the Company in the near-term would undervalue the return on investment we believe shareholders will realize as a result of the approval and launch of exenatide once weekly.

> Consistent with his history in several recent and current proxy fights, Mr. Icahn wants to employ a "cookie-cutter" approach to slashing costs, without any regard to the specific nature of Amylin's business. His one-size-fits-all methodology is exemplified by his identifying insurance and logistics as potential areas for addition-

While, if taken at face value, these statements would suggest that the board has concluded that the dissidents would be harmful to the company, such a reading would be inappropriate. Election "puffery" in the context of a fight letter is hardly the same as a determination by the board, in the exercise of its power to approve Continuing Directors, that the election of one or more of the stockholder nominees would be harmful to the corporation or the interests of its stockholders.

Second is the posture in which the board appears to have made its decision to approve. On March 9, 2009, the plaintiff asked the board to act to approve the stockholder nominees. The board did not do so until April 13, 2009, and then only in exchange for a partial settlement with the plaintiff in which the plaintiff agreed to amend its complaint to remove any allegations of breach of the duty of loyalty by the individual defendants, and not to seek money damages against them. These circumstances at least raise a question whether the board's decision to approve was made in a good faith exercise of its considered business judgment, or instead taken simply to avoid facing a suit for money damages against themselves personally.[40]

Given the underdeveloped state of the record, any judgment about the propriety of the Amylin board's decision to "approve" the insurgent nominees would appear to risk prejudicing the rights of one of the parties to this case. Alternately, the court can treat the issue as unripe and leave it to be determined at such later time as the record can be more fully developed. In light of the fact that the dissident parties have reduced the size of their respective slates so that even if both slates are elected a majority of the board will remain Continuing Directors, regardless of the board's approval or lack thereof of the stockholder nominees, the latter course is preferable. If the dissident nominees are successful in fostering a sale of the company, the issue of Continuing Directors may become irrelevant long before next year's annual stockholder meeting. Alternately, the plaintiff or Amylin is free after the 2009 annual meeting to replead its case that the stockholder nominees, if they are in fact elected, are Continuing Directors by virtue of Amylin's "approval," whatever form that approval may ultimately take.[41]

al savings, neither of which are significant components of Amylin's cost structure. His actions would undermine our efforts to prepare for and launch exenatide once weekly.

Mr. Icahn and Eastbourne show a serious lack of understanding of Amylin's business and the value-enhancing opportunities that the Company has created in the marketplace. The Company's future opportunity is tied directly to the FDA approval for and successful launch of exenatide once weekly. Their desire to disrupt the Company's operations and focus in the middle of the FDA process could potentially derail the launch preparations for exenatide once weekly. This demonstrates that both Mr. Icahn and Eastbourne fail to appreciate the sensitivities and potential shareholder value that we expect will result from the successful execution of this process.

At the upcoming annual meeting, you have a clear choice: vote for your Board's plan, which is close to achieving its strategic objectives to build value for all shareholders, or take your chances with the Icahn and Eastbourne platform, which demonstrates a disregard for the fundamental drivers of our business.

Neither Mr. Icahn nor Eastbourne has offered any constructive ideas as to how they would lead Amylin differently.

**40.** The court by no means concludes that this is, in fact, what motivated the board's decision. But absent any facts about the board's decision-making process, the court cannot rule it out.

**41.** Because there is no chance that a default or acceleration obligation will result from any

At that point, the relevant facts will be frozen, and the parties will have ample time for fact discovery to develop a complete record for the court to consider, in light of today's ruling. The court recognizes the potential diseconomy of requiring the parties to re-litigate the issue at a later time. However, the risk of prejudice to either the Amylin stockholders or the noteholders of an improvident decision made in a factual vacuum, at a time when there is no urgent need for decision, outweighs the potential costs of future litigation.

## III.

■■■ In addition to its claims sounding in contract, the plaintiff alleges that the board of Amylin breached its duty of care in the adoption of the Indenture for the 2007 Notes, insofar as the Indenture contained the Continuing Directors provisions. The plaintiff bases its claim largely on the fact that the Pricing Committee never discovered during its approval process that the proposed Indenture contained a Continuing Directors provision.[42]

■■■ The duty of care requires that: in making business decisions, directors must consider all material information reasonably available, and that the directors' process is actionable only if grossly negligent.... [T]he standard for

judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering only *material* facts that are reasonably available, not those that are immaterial or out of the Board's reasonable reach.[43]

Thus, the question is squarely framed: was the board of Amylin (or its delegate, the Pricing Committee) grossly negligent in failing to learn of the existence of the Continuing Directors provisions?

The answer must be no. The board[44] retained highly-qualified counsel. It sought advice from Amylin's management and investment bankers as to the terms of the agreement. It asked its counsel if there was anything "unusual or not customary" in the terms of the Notes, and it was told there was not. Only then did the board approve the issuance of the Notes under the Indenture. This is not the sort of conduct generally imagined when considering the concept of gross negligence, typically defined as a substantial deviation from the standard of care.

The plaintiff argues that the board's questioning if there was anything "unusual or not customary" in the Indenture was insufficient. But the way in which the board inquired into the material terms of the Indenture cannot be equated with

choice the stockholders might make in the 2009 Amylin director elections, there is no reason to suspect that the Continuing Directors provisions should have a significant influence on the outcome of the election, even without a ruling by the court that the stockholder nominees are Continuing Directors.

42. Moreover, the plaintiff points out, Amylin's CEO and its CFO both admit that they had no idea of the existence of the Continuing Directors provisions until they read about them on February 2, 2009. This may, on the surface, seem compelling for its "shock value." But because the CFO is not a director, and

there is nothing in the record to indicate whether the CEO, who is a director, was a member of the Pricing Committee, this information does little if anything to support the plaintiff's claim.

43. *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984)).

44. For the purposes of the discussion of the due care claim, references to the board encompass acts taken by the Pricing Committee on behalf of the board.

gross negligence in failing to inform itself.[45] Certainly, no one suggests that the directors' duty of care required them to review, discuss, and comprehend every word of the 98–page Indenture.

This case does highlight the troubling reality that corporations and their counsel routinely negotiate contract terms that may, in some circumstances, impinge on the free exercise of the stockholder franchise. In the context of the negotiation of a debt instrument, this is particularly troubling, for two reasons. First, as a matter of course, there are few events which have the potential to be more catastrophic for a corporation than the triggering of an event of default under one of its debt agreements. Second, the board, when negotiating with rights that belong first and foremost to the stockholders (i.e., the stockholder franchise), must be especially solicitous to its duties both to the corporation and to its stockholders. This is never more true than when negotiating with debtholders, whose interests at times may be directly adverse to those of the stockholders. Outside counsel advising a board in such circumstances should be especially mindful of the board's continuing duties to the stockholders to protect their interests. Specifically, terms which may affect the stockholders' range of discretion in exercising the franchise should, even if considered customary, be highlighted to the board. In this way, the board will be able to exercise its fully informed business judgment.

## IV.

For the reasons set forth above, as to Count I (alleged breach of the duty of care by the defendant directors), judgment is entered for the defendants. Count II, seeking a declaration of the invalidity and unenforceability of the Continuing Directors provision of the Credit Agreement, has been rendered moot by the parties and is DISMISSED. Count III, seeking a declaration that the board of Amylin is entitled to approve the dissident nominees for the purposes of the Indenture, together with Amylin's substantially similar cross-claim against the Trustee are GRANTED to the extent described in this opinion, and are otherwise held to be unripe for adjudication at this time and therefore DISMISSED WITHOUT PREJUDICE. IT IS SO ORDERED.

---

**45.** The fact that a term is customary is not proof that it is, in fact, either permissible or justifiable under the specific circumstances faced by the board. *See La. Muni. Police Employees' Retirement Sys. v. Crawford*, 918 A.2d 1172, 1181 n. 10 (Del.Ch.2007).