## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

J.P. MORGAN TRUST COMPANY OF            )
DELAWARE, TRUSTEE OF THE FISHER 2006    )
TRUST F/B/O HADLEY FISHER U/A DTD       )
2/16/2006,                              )
                                        )
    Petitioner,                         )
                                        )
    v.                                  )   C.A. No. 12894-VCL
                                        )
HADLEY FISHER and MICHAEL FISHER,       )
                                        )
    Respondents.                        )

## MEMORANDUM OPINION

Date Submitted: May 18, 2021
Date Decided: June 14, 2021

Richard L. Renck, Jocelyn M. Borowsky, DUANE MORRIS LLP, Wilmington, Delaware; *Counsel for Petitioner.*

Jeffrey S. Goddess, COOCH AND TAYLOR, P.A., Wilmington, Delaware; Michael H. Friedman, Jeffrey S. Peters, KURZMAN EISENBERG CORBIN & LEVER, LLP, White Plains, New York; *Counsel for Hadley Fisher.*

Christopher P. Simon, Kevin S. Mann, CROSS & SIMON, LLC, *Guardian* Ad Litem *for Michael Fisher and the interests of other minor and unborn issue of Hadley Fisher.*

**LASTER, V.C.**

J.P. Morgan Trust Company of Delaware ("JP Morgan") served as the trustee of a trust for the benefit of Hadley Fisher and his heirs (the "Trust").[1] Hadley's only heir is his minor son, Michael, who is represented by a guardian *ad litem*.

JP Morgan filed this litigation against Hadley and Michael (the "Beneficiaries"). JP Morgan seeks a broad declaration that it did not commit any breaches of duty during its service as trustee from 2010 through 2016. The Beneficiaries filed counterclaims in which they sought monetary damages from JP Morgan. By the time of trial, the Beneficiaries contended that JP Morgan breached its duty of care by acting in a grossly negligent fashion while overseeing the Trust. The Beneficiaries made noises about loyalty breaches, but they did not articulate those theories sufficiently to support relief.

This post-trial decision finds that JP Morgan did not commit any actionable breach of duty. Judgment will be entered in favor of JP Morgan and against the Beneficiaries.

## I.  FACTUAL BACKGROUND

The parties agreed to 110 stipulations of fact in the pre-trial order. During a two-day trial, four fact witnesses and four expert witnesses testified live. The parties also introduced 184 exhibits and lodged transcripts from thirteen depositions.[2]

---

[1] Numerous members of the Fisher family appear in the case. To avoid confusion, this decision refers to them by their first names.

[2] Citations in the form "PTO ¶ —" refer to stipulated facts in the pre-trial order. Dkt. 173. Citations in the form "[Name] Tr." refer to witness testimony from the trial transcript. Citations in the form "[Name] Dep." refer to witness testimony from a deposition transcript. Citations in the form "JX — at —" refer to a trial exhibit with the page designated by the last three digits of the control or JX number or, if the document

The standard of proof for all issues was a preponderance of the evidence. *See Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009), *aff'd*, 991 A.2d 1153 (Del. 2010). The court assigned the burdens of proof and persuasion to JP Morgan, which initiated this action by seeking a declaratory judgment that it had complied with its fiduciary duties in all respects. *See San Antonio Fire & Police Pension Fund v. Amylin Pharms., Inc.*, 983 A.2d 304, 316 n.38 (Del. Ch. 2009), *aff'd*, 981 A.2d 1173 (Del. 2009) (ORDER). The Beneficiaries asserted counterclaims concerning a subset of the all-encompassing relief that JP Morgan requested. But for JP Morgan's initiation of this proceeding, the Beneficiaries would have borne the burdens of proof and persuasion on their counterclaims. *See Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *18 (Del. Ch. Mar. 30, 2017).

## A.     Richard Fisher And His Children

The trail that led to the current dispute started with Richard L. Fisher. He was a senior partner in Fisher Brothers, a prominent family-owned firm that owns, develops, and leases commercial real estate in Manhattan. Through his business activities, Richard came to own interests in nearly seventy multi-tiered partnerships, limited liability companies, and corporations. The parties have not specified a value for these interests, but it seems uncontroversial that their value exceeded $100 million.

---

lacked a control or JX number, then by the internal page number. If a trial exhibit used paragraph numbers or sections, then references are by paragraph or section.

Richard had three children: Hadley, Winston, and Alexandra. Richard's eldest son, Hadley, has learning disabilities, attended special schools, and received accommodations under the Americans With Disabilities Act. He worked in various roles in the family business, but his performance fell short of Richard's expectations. Richard concluded that Hadley did not possess the qualifications to become a partner in Fisher Brothers.

Richard's younger son. Winston, had a different trajectory. He succeeded in school, then performed well as an analyst in the family business. He worked for other financial institutions, then became a partner in Fisher Brothers.

Alexandra did not become involved in the family business. She does not figure prominently in the case.

During their youth and early adulthood, Hadley and Winston clashed over many issues. They became estranged and no longer speak to each other.

B.      **Richard's Estate Plan**

 In early 2006, at age sixty-five, Richard looked forward to marrying for a fourth time. Sadly, he also suffered from cancer. With his health deteriorating, Richard turned to Martin Edelman, a lawyer with Paul Hastings LLP, to craft a new estate plan.

At the center of Richard's estate plan was RLF Assets LLC, a newly formed Delaware limited liability company. *See* JX 4 (the "LLC Agreement"). The entity had three members: Winston; the Trust, which Richard created for Hadley and his heirs, and a second trust that Richard created for Alexandra and her heirs. *See* JX 3 (the "Trust Agreement")..

The member interests that Winston and the trusts received were not equal. Winston received a full member interest that carried both voting and economic rights. The LLC

3

Agreement also designated Winston as the managing member of RLF Assets with sole authority to conduct its business and affairs.

The trusts received special member interests that did not carry any voting rights and initially did not have any economic rights. In fact, Section 2.2 of the LLC Agreement provided that the trusts held 0% member interests in RLF Assets. As holders of the special member interests, the trusts did not have any authority over RLF Assets, its business, or its affairs. Regardless, any rights that the trusts might have had were controlled by their trustees. The initial trustees of the Trust were Winston, Edelman, and Kenneth Fisher, Richard's nephew and another partner in Fisher Brothers.

At formation, RLF Assets had no operating assets. It was an estate planning vehicle designed to become operative at Richard's death. The mechanism for transferring the bulk of Richard's wealth to RLF Assets was an option agreement between RLF Assets and Richard. JX 5. Upon Richard's death, the option agreement gave RLF Assets the right to purchase all of Richard's various business interests at a price optimized for estate tax purposes (the "Fisher Brothers Option"). As the managing member of RLF Assets, Winston had the authority to determine whether RLF Assets exercised the Fisher Brothers Option. Without delving into the details, the terms of the Fisher Brothers Option made it economically irrational for Winston not to cause RLF Assets to exercise it. In substance, the structure effectuated a transfer of Richard's assets to RLF Assets upon his death.

Once Winston caused RLF Assets to exercise the Fisher Brothers Option, then RLF Assets became obligated to make distributions to the special members. During each of the first ten years after the exercise of the Fisher Brothers Option, RLF Assets was obligated

4

to distribute at least $600,000 to each special member and, if sufficient net cash flow was available, up to $1,200,000. Beginning in the eleventh year after exercise, the minimum distribution would increase to $700,000 and the maximum to $1,400,000. Any remaining net cash flow from RLF Assets went to Winston. JX 4 § 7.2(d).

The exercise of the Fisher Brothers Option also gave RLF Assets the right to acquire the special member interests on the tenth, fifteenth, twentieth, or twenty-fifth anniversary of the option's exercise (the "Special Member Buyout"). The LLC Agreement set the purchase price for each special member interest at $10 million. By exercising the Special Member Buyout, RLF Assets could stop paying distributions to the special members. Without delving into the details, it was economically rational for Winston to cause RLF Assets to exercise the Special Member Buyout in the tenth year.

Richard signed all of the documents in his estate plan except for the LLC Agreement. That document, which heavily favored Winston, was signed by Winston as Managing Member of RLF Assets and by the trustees of the trusts—Winston, Kenneth, and Edelman.

## C. The Estate Litigation

Richard died on August 5, 2006, just months after creating his estate plan. In his will, Richard appointed Winston, Kenneth, and Edelman as the executors of his estate. On October 23, 2006, Winston caused RLF Assets to exercise the Fisher Brothers Option.

After Richard's death, disputes arose among his heirs. Richard's estate plan conflicted with a prenuptial agreement between Richard and his widow, Kristen Kelly Fisher. Richard's estate plan also conflicted with a separation agreement that Richard

5

executed in 1994 with a previous spouse, which provided that 75% of his estate would go to his issue *per stirpes*. *See* JX 13 ¶ D.

Kristen filed a lawsuit in the New York County Surrogate's Court (the "Surrogate's Court") to establish her rights, and the litigation expanded to include the various parties with claims to Richard's assets (the "Estate Litigation"). Hadley hired Sandy Schlesinger, a well-regarded trusts and estates lawyer, to represent him. Two years later, in 2008, Hadley retained Diana Zeydel, a lawyer with Greenberg Traurig LLP, as additional counsel. Zeydel's practice focused on estate and tax planning for high net worth individuals and their families.

The Estate Litigation concluded with a settlement agreement dated March 19, 2010 (the "Estate Settlement Agreement"). Hadley signed the Estate Settlement Agreement in his individual capacity, and the agreement provided that its terms were binding upon both Hadley and his heirs. *Id.* ¶¶ 38, 40, 51. In the Estate Settlement Agreement, Hadley granted "a full, complete, absolute and final release" to all parties to the agreement, including Winston, for "any cause of action or alleged cause of action," even causes of action arising after "discovery [of] claims or facts in addition to or different from those currently known," or based on "any mistake of fact." *Id.* ¶¶ 38, 40.

As part of the settlement of the Estate Litigation, the parties entered into an agreement with RLF Assets, also dated March 19, 2010. JX 12 (the "RLF Ratification Agreement"). In that agreement, the parties agreed that the LLC Agreement was "ratified and confirmed [to] continue in full force and effect." *Id.* ¶ K. The RLF Ratification Agreement further provided:

6

> Each party . . . fully understands the terms of this Agreement and having those terms fully explained to him . . . and any questions answered, shall not later allege that no meeting of the minds occurred with regard to this Agreement; . . . each party is represented by legal counsel of that party's choice, is fully aware of the terms contained in this Agreement and has voluntarily and without coercion or duress of any kind entered into this Agreement.

*Id.* ¶ N. The RLF Ratification Agreement provided that its terms "shall be binding upon and shall inure to the benefit of the parties hereto and, to the maximum extent allowable by law, their respective heirs." *Id.* ¶ R.

## D.    JP Morgan Becomes Successor Trustee.

As part of the settlement of the Estate Litigation, Winston, Kenneth, and Edelman agreed to resign as trustees of the Trust. JP Morgan took over as successor trustee.

Hadley's relationship with JP Morgan began in 2006, a few months after Richard died. During that period, Hadley met Philip McNeal, a managing director with JP Morgan Private Bank, a division of JP Morgan Chase Bank, N.A. McNeal worked in the Executive Wealth Group, which was part of the Asset & Wealth Management Division.

McNeal managed the Private Bank's relationship with the Fisher family. In summer 2007, McNeal introduced Hadley to Jordan Sprechman, a wealth advisor from the Private Bank. In April and June 2008, McNeal pitched Hadley on having JP Morgan become the successor trustee for the Trust. During the April meeting, McNeal introduced Hadley to Donna Coyne, a trust officer at JP Morgan's affiliate in Delaware. The possibility of having the Delaware affiliate serve as successor trustee was part of the pitch, and Coyne was brought in to help sell Hadley on the idea. *See* Coyne Tr. 133, 138–43.

7

Over the next two months, Hadley and Coyne had a series of conversations about the Delaware affiliate serving as successor trustee. Coyne explained the difference between a traditional trust, under which the trustee has discretionary authority over the trust corpus, and a directed trust, under which Hadley or someone of his choosing would act as an advisor and instruct JP Morgan regarding the exercise of its authority. Coyne informed Hadley that the Delaware affiliate only handled directed trusts, and therefore the Trust would need to become a directed trust if Hadley wanted the Delaware affiliate to serve as successor trustee. Coyne explained how that could be accomplished, describing the differences between decanting and reformation.

By the end of 2008, the discussions about JP Morgan serving as successor trustee had lost momentum. They lay dormant until January 2010, when the settlement negotiations in the Estate Litigation were nearing conclusion. As part of that process, Hadley contacted Sprechman about JP Morgan serving as successor trustee. *See* JX 8.

In February 2010, Sprechman met with Hadley and his counsel. After the meeting, Sprechman sent Hadley and his counsel a formal proposal that outlined two options for the Trust. One was for a New York affiliate to act as a traditional trustee for an annual fee of $62,500. The other was for the Delaware affiliate to serve as a directed trustee for an annual fee of $10,000. JX 9.

On April 6, 2010, after signing the Estate Settlement Agreement and the RLF Ratification Agreement, Hadley and his counsel met with Sprechman about the arrangements for JP Morgan to become successor trustee. Hadley chose to have JP Morgan serve as the trustee of a directed trust. *See* JX 14; JX 15. Sprechman drafted a New Business

8

Memorandum memorializing Hadley's choice and reflecting that the Trust would be modified "to include Investment Advisor, change of law, resignation/removal, and other language [JP Morgan] would require." JX 22. The memorandum noted that the Executive Wealth Group "expect[ed] to earn around $1,000,000 from the Fisher family relationship in 2010." *Id.* Sprechman notified Coyne, who began making arrangements to "onboard" the Trust. *See* JX 17.

On April 14, 2010, Hadley and one of his attorneys, Martin Goodman, contacted JP Morgan with two requests. First, they asked JP Morgan to reduce its annual fee from $10,000 to $7,500. *See* JX 20. In part because of the Private Bank's relationship with Fisher Brothers, JP Morgan agreed. *See id.*; JX 19. Second, Hadley and his lawyer said that JP Morgan needed to become the successor trustee *the next day*. *See* JX 19; JX 20. Sprechman thought that was unreasonable, and he told McNeal and Coyne that "[w]ere it not for the substantial relationship with the Fishers, I would be inclined to walk away from the whole thing." JX 19. McNeal agreed. JX 21. At least in part because of the Private Bank's "substantial relationship" with the Fisher family, JP Morgan did not "walk away."

Goodman subsequently spoke with Sprechman, claiming that the settlement of the Estate Litigation would fall apart unless JP Morgan could become successor trustee before April 18, 2010, when the lawyers presented the settlement to the Surrogate's Court. JX 20. Sprechman viewed the whole exercise as a "[f]ire drill." *Id.* He nevertheless told Coyne, "I think that owing to the fact that we have a lucrative relationship with the Fisher family, we [will] do our best." *Id.* Sprechman and Coyne obtained management approval within days, which was unprecedented. Coyne Tr. 181.

McNeal facilitated the process with an eye to his relationship with the Fisher family. Several years later, in an email briefing her successor on the relationship with Hadley, Coyne provided the following description of events:

> Phil McNeal was the banker and had a large relationship with the Fisher Brothers and their bank so he really pushed Jordan and Anne (who was the [New Business Memorandum] approver at the time) to take this on even though JPM had one day to accept the successor role, open accounts and be ready to fund the trusts as part of the proposed litigation settlement.

JX 85A. The contemporaneous evidence corroborates her account.

When JP Morgan took on the role of trustee, the JP Morgan team did not know the full details of the Trust, much less the larger structure that Edelman had created for Richard. JP Morgan had not received the LLC Agreement for RLF Assets and did not know that the Trust's sole asset was a special member interest in a company that Winston controlled. JP Morgan did not know that the special member interest carried only a limited right to distributions, had no voting power or authority over the business and affairs of RLF Assets, and was subject to the Special Member Buyout. Sprechman believed, erroneously, that the Trust owned real estate from Richard's interest in the Fisher Brothers empire.[3] Coyne believed, erroneously, that Hadley eventually would receive approximately $100 million

---

[3] *See* JX 8 (expressing belief that the trust owned "interests in real estate"); JX 22 at '124 ("The trust's sole asset is an interest in the Fisher family's real estate empire."); *id.* at '125 (describing trust's sole asset as "Ownership interest in Fisher family invstments, which owns interests in the Fishers' real estate empire").

after Richard's estate was finally resolved, resulting in a "significant opportunity" for JP Morgan.[4]

**E.      JP Morgan's First Months As Trustee**

After becoming successor trustee, JP Morgan sought to gain a better understanding of the Trust and its assets. On the day *after* JP Morgan became successor trustee, McNeal demanded that his team obtain the LLC Agreement so that JP Morgan could "clearly understand the entire fact set" and "get on with what we have to do both on the fiduciary side and on the investment side." JX 27 at '373.

JP Morgan did not receive the LLC Agreement until two months later, in June 2010. JX 29. Upon reviewing it, the JP Morgan team was surprised to learn that the Trust held a special member interest that was listed as having a 0% economic interest in RLF Assets. *See id.* They also learned that the special member interest only had a limited right to distributions, had no rights regarding the business and affairs of RLF Assets, and was subject to the Special Member Buyout. *Id.*

McNeal and Coyne called Goodman, who was unhelpful. *See id.*; JX 30. Coyne reached out to Scott Ditman, an accountant with Berdon LLP, who served as the principal accountant and advisor to the Fisher family. Ditman prepared the tax returns for the members of the Fisher family and their affiliated entities. In that role, Ditman had served

---

[4] JX 18; *see* JX 42 (Coyne reporting that with settlement of dispute over Richard's estate, Hadley was expected to "receive a large lump sum of money which we hope Phil [McNeal] and his team will have the opportunity to manage for Hadley").

11

as Hadley's tax accountant, and he had acted as the accountant for RLF Assets and the Trust since 2006. Ditman explained the structure of RLF Assets and how it made distributions to the Trust. *See* JX 31.

JP Morgan considered whether to have Ditman continue to prepare the Trust's tax filings or whether to shift that function to a different preparer. JP Morgan decided that Ditman should continue preparing the Trust's returns, in part because Ditman also prepared Hadley's personal tax filings and the returns were intertwined. *See id.*; JX 37; JX 38.

With JP Morgan having taken over as trustee, Coyne instructed the CFO of Fisher Brothers to pay a bill for trust expenses using cash belonging to the Trust. Hadley had instructed JP Morgan to leave the cash at Fisher Bank, an affiliate of Fisher Brothers, where it earned a higher rate of return than it would at JP Morgan. The CFO of Fisher Brothers took umbrage at Coyne's request and complained to McNeal. Plainly viewing Fisher Brothers as his primary client, McNeal sought to protect that relationship by raising the issue with Coyne's boss. *See* JX 34; JX 35. Coyne had acted properly, and no disciplinary action was taken.

During this period, JP Morgan received a notice dated July 23, 2010, from the Surrogate's Court. The notice advised that the Surrogate's Court would be taking certain actions to implement the Estate Settlement Agreement, including:

- Settling the accounts of the executors of Richard's estate;

- Discharging and releasing the executors from liability related to their acts as executors;

- Approving the payment of monies owed to Edelman for his executor's commissions;

12

- Approving payment of monies owed to various legal and accounting firms for work performed in connection with administering the estate; and

- Approving the payments to various parties contemplated by the Estate Settlement Agreement.

JX 36. The notice invited recipients to appear and show cause why the court should not proceed as contemplated by the Estate Settlement Agreement.

JP Morgan elected not to appear. Dave Diamond was then-head of the directed trust business, and he decided that JP Morgan would not attend because JP Morgan had a policy of not reviewing the acts of the prior fiduciaries. *See* Coyne Tr. 175–76.

Setting aside JP Morgan's policy, it would have been counterintuitive for JP Morgan to appear and contest the Estate Settlement Agreement. Hadley had signed that agreement with the assistance of counsel, and JP Morgan's status as successor trustee resulted from the resignations of the predecessor trustees under the terms of the Estate Settlement Agreement. Hadley hired JP Morgan to serve as successor trustee to carry out the Estate Settlement Agreement. JP Morgan had no reason to seek unilaterally to set aside the Estate Settlement Agreement or to think that it needed to explore potentially doing so.

## F. JP Morgan Seeks To Convert The Trust Into A Directed Trust.

When JP Morgan and Hadley discussed having JP Morgan's Delaware affiliate serve as a successor trustee, Hadley committed to convert the Trust to a directed trust. JP Morgan agreed to charge a lower fee because the Trust would be converted to a directed trust. But once JP Morgan became successor trustee, Hadley balked. He resisted the conversion and did not want to pay the fees necessary to accomplish it. *See* JX 42.

13

In early 2011, JP Morgan sought to move forward with the conversion. *See* JX 41; JX 42. JP Morgan only handled directed trusts through its Delaware affiliate, so having that affiliate serve as the trustee of a non-directed trust ran counter to JP Morgan's policies. The JP Morgan team also felt, understandably, that Hadley was reneging on an agreement.

By this time, however, Hadley had come to believe that Winston had snookered him in the Estate Settlement Agreement and that he had received far less than his fair share of Richard's estate. Hadley's frustration extended to JP Morgan, whom he suspected of being loyal primarily to Fisher Brothers and his family. *See* JX 43. When JP Morgan sought to move forward with converting the Trust, Hadley began complaining that JP Morgan should have been more effective "in getting him a seat at the Fisher Brothers table and/or information on the business." *Id.*

Hadley had reason to be suspicious, because McNeal was Hadley's principal contact. McNeal also was the principal contact for the Fisher family, and he was fixated on protecting that relationship and, if possible, expanding it. There is no evidence, however, that McNeal's personal interest in growing his book of business with the Fisher family compromised JP Morgan's handling of the Trust.

If anything, McNeal's personal interest in avoiding anything that might strain his relationship with the Fisher family caused other JP Morgan personnel to bend over backward to help Hadley. For example, Coyne wanted JP Morgan to resign as trustee. *See* JX 46. McNeal resisted out of concern that such a move could create blowback for his relationship with the Fishers. *See id.* JP Morgan therefore continued acting as a full trustee,

14

despite having accepted the role based on Hadley's commitment that JP Morgan would serve as a directed trustee.

To mitigate any risk to McNeal's relationship with the Fishers, Coyne tried to find solutions that were acceptable to Hadley. One possibility was to terminate the Trust so that Hadley would own the special member interest himself, but termination would have adverse tax consequences for Hadley, and so it was not pursued. *See* JX 47, JX 48 at '456; JX 49. Another possibility was to find a trust company acceptable to Hadley that would serve as successor trustee. The Alaska Trust Company was willing to serve, but only if the Trust was decanted into a new trust administered under Alaska law. *See* JX 48 at '456–57; JX 49. That was feasible, but before resigning as trustee, JP Morgan insisted on a release for all of its actions. Hadley refused to provide the release, so the Alaska option went nowhere. *See* JX 59 at '030. A final possibility was for JP Morgan to resign in conjunction with JP Morgan petitioning the Court of Chancery to appoint a successor trustee. *See* JX 53. JP Morgan correctly anticipated that the Court of Chancery would not look fondly on a professional trustee seeking to escape its role unless JP Morgan had identified a viable successor trustee (or the situation was much more dire). JP Morgan astutely did not pursue that option either.

On March 30, 2012, after approximately a year of trying unsuccessfully to reach an accommodation with Hadley, JP Morgan informed Hadley that it was resigning unilaterally. JX 51. Hadley's counsel, Zeydel, asked JP Morgan to retract its resignation as a professional courtesy to her so that she could redouble her efforts to find a successor trustee. JP Morgan agreed.

15

Hadley and Zeydel next contacted Elizabeth King, then a senior fiduciary officer at Northern Trust Company. Like JP Morgan, Northern Trust was willing to serve as a directed trustee for a fee of $10,000 per year "until such time as Winston exercises the buyout option." JX 52.

King met with Hadley, Zeydel, and Ditman on July 10, 2012. *See* JX 54. King informed Hadley and his advisors that Northern Trust would become successor trustee only if the Trust was converted into a directed trust, citing the Trust's concentrated position in RLF Assets. Zeydel concluded that an arrangement could not be reached, and the discussions with Northern Trust broke down.

Meanwhile, Coyne remained frustrated that JP Morgan was serving as a full trustee for what was supposed to be a directed trust. In August 2012, she had another conversation with Hadley about the terms on which JP Morgan would resign, only to have Hadley insist that JP Morgan had "no right to resign." JX 55. That was plainly incorrect, and Coyne recommended to her superiors that JP Morgan should resign unilaterally. *Id.*

But JP Morgan still did not resign, leading Coyne to raise the issue again in October 2012. By this time, Hadley had started calling JP Morgan personnel to complain about his father's estate and the Estate Settlement Agreement. *See* JX 59. Coyne described the situation as a "nightmare" with Hadley "getting increasingly aggressive on his calls." *Id.* Coyne knew that McNeal had blocked JP Morgan from resigning before, and she worried about how McNeal would react. Sprechman reassured Coyne that resigning would not create any issues for the Private Bank and that she should present the resignation to McNeal as a "fait accompli." *Id.*

16

Once again, however, JP Morgan did not resign. Hadley has claimed in this litigation that JP Morgan did not resign because of loyalty to Fisher Brothers, but the evidence does not support that assertion. By this point, even McNeal had become convinced that JP Morgan should end its relationship with Hadley. He no longer thought that a resignation posed any threat to his relationship with the Fisher family. *See* JX 60 ("We want to exit this. Can you help us fill out the form? . . . Philip will sign it."); *see also* JX 59 at '030 (Sprechman stating that "[t]here is no risk to the relationship with Fisher Brothers overall, and I think Philip would confirm that"). Hadley had not brought any other busines to the Private Bank, and McNeal had stopped taking Hadley's calls. *See* JX 55.

For its part, JP Morgan has claimed in this litigation that JP Morgan did not resign because the Trust Agreement lacked a mechanism to identify a successor trustee automatically and that it did not want to leave Hadley in a lurch. The evidence does not support that assertion either. JP Morgan previously had resigned unilaterally, only to retract its resignation as a professional courtesy to Zeydel. JP Morgan also knew that if the situation became bad enough, it could petition the Court of Chancery to appoint a successor trustee.

The real reason that JP Morgan did not resign was institutional inertia. JP Morgan did not want to resign without either (i) a release from Hadley, which he would not give, or (ii) an order from the Court of Chancery, which JP Morgan did not want to seek. As Coyne explained to a colleague, in April 2014, seeking judicial approval would cost money, but the Trust's only liquid assets were at Fisher Bank, outside of JP Morgan's control. JX 65; *see* JX 66; *see also* JX 59 at '030 ("JPM has no liquidity in the trust to pay

17

for a court proceeding as all we hold is a memo entry regarding the LLC. All the cash is at Fisher Brothers"). Moreover, JP Morgan believed that filing a petition would "raise old wounds" with Hadley about the Estate Litigation. JX 59 at '030.

Resigning and petitioning the court thus would cost money, could create conflict with Hadley, and might spark a larger fight. Continuing to act as trustee was the path of least resistance. The Trust held only one meaningful asset—the special member interest. It received a distribution once per quarter, which JP Morgan passed along to Hadley. Ditman prepared the Trust's tax return. The status quo was easy to maintain. Hadley regularly complained about the fee he paid annually to JP Morgan for doing so little, but otherwise the situation was stable. *See* JX 65; JX 66; JX 69. JP Morgan therefore continued as trustee.

## G. JP Morgan Moves The Tax Work To Deloitte.

In 2014, as part of a bank-wide initiative, JP Morgan moved the preparation of the Trust's tax returns from Ditman to Deloitte LLP. JP Morgan did not have any reason to be concerned about Ditman's work. JP Morgan took this step to reduce overall enterprise risk by making its tax preparation practices consistent across clients.

Ditman expressed concern about being replaced. *See* JX 69 at '059. Hadley contends that Ditman was not worried about the lost fees, which were minor, but rather about whether Deloitte might change the tax treatment of the payments made to the Trust. Hadley argues that Ditman's irritation should have made JP Morgan suspicious, and that JP Morgan should have had Deloitte take a fresh look at the prior tax returns. The contemporaneous documents do not suggest any reason for JP Morgan to have questioned Ditman's actions.

In February 2015, JP Morgan considered internally whether RLF Assets was handling the special member interest appropriately for tax purposes. *See* JX 71. Michael Yulsman, who was then working on Hadley's account, requested advice from JP Morgan's internal tax experts regarding both the treatment of the annual distributions and the potential treatment of the Special Member Buyout. *Id.* In response, a Morgan Stanley tax expert suggested that there might be different ways to treat the interest, including by having Winston be taxed on all of RLF Assets' income. *Id.* As part of JP Morgan's review, the tax expert obtained and reviewed the returns for prior years that Ditman had prepared, and Yulsman spoke with Ditman. *See* JX 73; JX 74. Ditman took the position that the Special Member Buyout was subject to capital gains tax. *See* JX 75.

## H.    RLF Assets Exercises The Special Member Buyout.

In May 2016, Winston initiated the process for the Special Member Buyout. Mary McKenna, an attorney with Paul Hastings who had drafted the LLC Agreement, gave notice to Zeydel at Greenberg Traurig that Winston intended to exercise the Special Member Buyout. Greenberg Traurig informed JP Morgan. By this time, King had joined JP Morgan as the head of its directed trust business, and Pamela Torino had taken over from Coyne as the trust officer for the Trust.

Greenberg Traurig reported that according to Ditman's firm, which was still serving as the accountants for RLF Assets,

> Hadley's trust has no basis in its special member[] interest other than the $5,000 it paid to acquire its special member[] interest. Although we believe that we have strong arguments that the acquisition didn't actually take place until after the death of Richard Fisher such that the trust would have basis equal to the fair market value (at least $10,000,000). Nonetheless, the

19

potential of a significant capital gain would be devastating to Hadley's lifestyle.

JX 86 at '693. Because of the tax consequences, the Trust would not receive $10 million. Net of taxes, the Trust would receive approximately $7 million. *See* JX 111; JX 118.

Greenberg Traurig identified two strategies for opposing the Special Member Buyout. The first was to object to the notice as premature. The second was to rely on Section 6.4(c) of the LLC Agreement, which stated that

> [p]romptly after a Buyout Notice has been given by the Managing Member, he shall enter into a purchase and sale contract with the Special Members, specifying the aggregate purchase price of the Special Member interests (the "Purchase Price"), the closing date of the purchase (the "Closing Date") and other economic terms set forth in this Section and otherwise in form and substance reasonably satisfactory to the Managing Member and the Special Members. The Purchase Price shall be $20,000,000 with respect to the first Buyout Option.

JX 4 § 6.4(c). Adopting an aggressive interpretation of this provision, Greenberg Traurig planned to argue that if Hadley had to pay capital gains taxes on the $10 million payment he received for his special member interest, then the "form and substance" of the purchase and sale contract would not be "reasonably satisfactory."

King assembled a team of professionals to evaluate the Trust's options. In addition to Torino, the internal team included Yulsman and Wook Kim from JP Morgan's in-house legal department and Michael Conway and Charles Patel from its in-house tax department. King also consulted with Paula Baker, JP Morgan's chief fiduciary officer. Externally, King involved tax accountants at Deloitte. Most significantly, she retained a team of lawyers from Duane Morris LLP, headed by Jocelyn Borowsky, a leading Delaware trusts

20

and estates attorney. King asked Borowsky to evaluate Greenberg Traurig's arguments and map out a strategy.

On June 20, 2016, Borowsky had a call with Greenberg Traurig, during which Zeydel suggested a potential lawsuit against Winston for self-dealing. Zeydel theorized that the signing of the LLC Agreement was an interested transaction because Winston had signed on behalf of RLF Assets in his capacity as its Managing Member and on behalf of the Trust as a co-trustee.

Borowsky researched the viability of potential claims against Winston with the assistance of Gutman Skrande, a Duane Morris trusts and estates lawyer. By early August 2016, Borowsky concluded that claims against Winston were unlikely to succeed, and she informed JP Morgan and Greenberg Traurig. *See* JX 89, JX 95. Greenberg Traurig did not express surprise and did not push back on Borowsky's assessment. Duane Morris documented its analysis in a formal memorandum dated August 24, 2016. JX 98.

## I.     The Real Estate Option

While Duane Morris evaluated the potential claims against Winston, Greenberg Traurig negotiated with Winston over alternatives to the Special Member Buyout. In mid-August 2016, those efforts resulted in Winston making an alternative proposal designed to mitigate the tax consequences of the buyout by enabling the Trust to maintain an investment in real estate (the "Real Estate Option").

Under the Real Estate Option, RLF Assets would form a new special purpose vehicle, capitalize it with $10 million in cash plus an interest in an investment fund equal to $2.5 million, and then use those assets to finance investments in real estate. *See* JX 91;

JX 96. Over time, the Trust's interest in the special purpose vehicle would increase while its ownership interest in RLF Assets would decrease. Ultimately, the Trust would become the sole owner of the special purpose vehicle and no longer be a special member of RLF Assets. As part of the Real Estate Option, the annual distribution that RLF Assets made to the Trust would fall from $600,000 to $300,000, and after June 2018, RLF Assets no longer would make distributions to the Trust. In theory, the Trust would receive distributions from the special purpose vehicle instead. *See* JX 91 at '562.

After receiving the proposal, Zeydel asked JP Morgan to take over the negotiations with Winston, citing the fact that the Trust held the special member interest in RLF Assets. Hadley told JP Morgan that Greenberg Traurig withdrew due to a conflict. *See* JX 102.

Borowsky stepped in. She and JP Morgan evaluated the Real Estate Option, concluding that it carried too much risk. The Trust's distributions from RLF Assets would be cut in half for two years, then stop. After that, the Trust would be left with an undiversified and indirect investment in real estate. Until the Trust became the sole owner of the special purpose vehicle, the Trust would not have any control over the investments that the special purpose vehicle made. Instead, Winston would control it. Even after the Trust became sole owner of the special purpose vehicle, it was not clear how much control the Trust would have over the legacy investments that Winston made during his period of control. Nor was it clear how liquid those investments would be. The chief benefit of the Real Estate Option was to avoid a taxable event for the Trust, but Winston was demanding a high price for that benefit. *See* JX 96.

22

Hadley disliked the Real Estate Option because it was so complicated. He wanted RLF Assets to forego exercising the Special Member Buyout so that his yearly distributions would increase from $600,000 to $700,000. *See* JX 103. Unfortunately for Hadley, that option was never on the table, and Winston never would have agreed to it.

## J.    The Securities Pool Option

In September 2016, Winston presented a second alternative to the Special Member Buyout. This proposal involved a special purpose vehicle that would purchase a pool of securities (the "Securities Pool Option"). Winston's lawyers warned Borowsky that if JP Morgan did not accept the Securities Pool Option, then Winston simply would "carry out the buyout pursuant to the existing operating agreement." JX 109.

Under the Securities Pool Option, Winston would contribute $20 million ($10 million each for the Trust and Alexandra's parallel trust) to a special purpose vehicle that would create an investment portfolio. Winston would manage the portfolio in his sole discretion. If the vehicle had sufficient cash available from its investments, then Winston would make distributions to each trust of up to $300,000 annually. Winston would retain the right to exercise an equivalent of the Special Member Buyout in either 2021 or 2026. *See id.*

Hadley disliked the Securities Pool Option because it reduced his distributions. He still wanted RLF Assets not to exercise the Special Member Buyout so that his yearly distributions would increase from $600,000 to $700,000. *See* JX 103. That option continued to be unavailable. Absent an agreement on an alternative, Winston was always prepared to exercise the Special Member Buyout.

23

As a counteroffer, JP Morgan asked Winston to guarantee annual distributions of $700,000, but Winston promptly rejected that request as "a nonstarter." JX 115. Instead, Winston tweaked the Securities Pool Option to guarantee a minimum distribution of $300,000 to each trust and to provide for additional distributions up to $600,000, depending on the income generated by the securities pool. JX 111.

JP Morgan evaluated the Securities Pool Option and determined that it was unattractive.

- The Trust's distributions would be between $300,000 and $600,000, depending on the income that Winston generated.

- JP Morgan would not have any visibility into or control over the securities pool, which Winston would manage in his sole discretion.

- The Trust still would face the possibility of a buyout in 2021 or 2026.

- Unless and until the buyout occurred, the Trust would remain under Winston's control, which was a source of conflict.

*See id.*; JX 144; King Tr. 394–95. The principal benefit of the Securities Pool Option was to defer the payment of capital gains taxes until the buyout took place, but there was no guarantee that tax rates would not be higher if the buyout occurred later.

## K.     The Cash Premium Option

By early October 2016, Winston had threatened to end negotiations and exercise the Special Member Buyout. JP Morgan decided the best approach was to maximize the amount of cash that the Trust received. *See* JX 118; King Tr. 396.

During a call with Winston's lawyers on October 13, 2016, Borowsky asked for a total buyout price of $13 million, reflecting a premium of $3 million over the Special

24

Member Buyout. *See* JX 127; JX 128; King Tr. 312–14. Winston's lawyers were terse and unwilling to negotiate. Later that day, Winston sent a "take it or leave it" offer of $11.5 million (the "Cash Premium Option"). JX 129.

JP Morgan asked its tax department and Deloitte to explore whether there were aggressive but defensible tax positions could be used to reduce the Trust's tax bill. *See* JX 131. Deloitte thought that based on the fixed purchase price in year ten for the special member interest, there might be positions that could lower the tax hit. *See* JX 133. King regarded that as a positive development. *See* King Tr. 353–54. JP Morgan also ran analyses to determine the annual returns that the after-tax sum reasonably could generate.

Hadley remained fixated on receiving annual cash distributions of at least $600,000. He asked JP Morgan to ask Winston to structure the Cash Premium Option so that the Trust would receive $1.5 million up front, then the remaining $10 million in the form of a promissory note bearing six percent interest, payable quarterly, with RLF Assets paying off the principal at a rate of $1 million per year. *See* JX 135. JP Morgan proposed the structure to Winston on October 20, 2016, and Winston rejected it two hours later. *See id.*

### L. JP Morgan Selects The Cash Premium Option.

On October 21, 2016, Winston sent JP Morgan a letter offering the Trust either (i) the Cash Premium Option or (ii) a modified Securities Pool Option that increased the buyout price in 2021 to $11.5 million. JX 136. The letter warned that if the Trust failed to select an option by November 7, 2016, then Winston would pursue arbitration to enforce the Special Member Buyout.

On November 1, 2016, JP Morgan and Hadley discussed the two options. Hadley demanded that JP Morgan file an arbitration against Winston and threatened to sue JP Morgan if it accepted either option. *See* JX 141.

Borowsky advised against arbitration. First, Borowsky thought the self-dealing claims were weak. She thought JP Morgan would lose the arbitration and waste the Trust's assets by pursuing it. Second, Borowsky thought an arbitrator would enforce the plain language of the Special Member Buyout, so the Trust would end up with $10 million rather than $11.5 million.

Hadley nevertheless insisted on arbitration. JP Morgan offered to arbitrate if Hadley signed a release of any claims against JP Morgan. Hadley refused to provide a release.

JP Morgan concluded that as between the Cash Premium Option and the Securities Pool Option, the Cash Premium Option was preferable. JP Morgan estimated that the after-tax proceeds from the Cash Premium Option would be approximately $7,705,000. JX 130. By investing those funds in a diversified portfolio, JP Morgan could generate annual returns that would be similar to the distributions under the Securities Pool Option, but without the $600,000 cap on the upside. More importantly, the trustee of the Trust would have control over the investment strategy, rather than having no visibility into a strategy that Winston chose in his sole discretion. The Cash Premium Option also facilitated a final separation between the Trust and Winston.

On November 7, 2016, JP Morgan formally selected the Cash Premium Option.

**M.      This Litigation**

On November 10, 2016, JP Morgan filed this action against the Beneficiaries. JP Morgan's petition sought an expansive declaratory judgment that it had complied with its legal and equitable duties in all respects. JP Morgan also asked the court to approve its accountings and to authorize JP Morgan to resign. *See* Dkt. 1; Dkt. 10. The Beneficiaries answered and asserted counterclaims. *See* Dkt. 16.

JP Morgan next moved for the appointment of a guardian *ad litem* for Michael. The court granted the motion. Dkt. 24.

JP Morgan formally moved for judgment on the pleadings on its request for leave to resign. The Beneficiaries did not oppose the request, which the court granted. Dkt. 33.

The parties commenced discovery, which was contentious. The Beneficiaries filed two motions to compel, both of which were granted. *See* Dkt. 68; Dkt. 97. The granting of the second motion to compel resulted in JP Morgan being forced to produce documents over which it had asserted privilege. *See J.P. Morgan Tr. Co. of Delaware v. Fisher*, 2019 WL 6605863 (Del. Ch. Dec. 5, 2019). JP Morgan subsequently elected to rely on an advice of counsel defense. *See* Dkt. 144 at 12.

## II.   LEGAL ANALYSIS

JP Morgan seeks an expansive determination that it complied with all of its legal obligations as a trustee such that it cannot be liable to the Beneficiaries. By seeking that determination, JP Morgan assumed the burden of persuasion on its claim. It is not realistic, however, for the court to evaluate every action that JP Morgan took during its six years of service as trustee. Analytically, it makes more sense to consider the challenges that the

27

Beneficiaries advance, recognizing that JP Morgan bears the burden of persuading the court that no actionable wrongdoing occurred and no remedy should be awarded.

A trustee owes duties of loyalty and care to a trust's beneficiaries. The duty of loyalty "requires a trustee to administer the trust solely for the interest of the beneficiary and exclude all selfish interests and all consideration of the interests of third persons." *Hardy v. Hardy*, 2014 WL 3736331, at *8 (Del. Ch. July 29, 2014). The duty of care requires a trustee to "administer the trust with 'the skill and care that a man of ordinary prudence would exercise in dealing with his own property in light of the situation existing at the time.'" *Id.* at *10 (quoting *Wilm. Tr. Co. v. Coulter*, 200 A.2d 441, 448 (Del. 1964)). "[A] corporate trustee who holds itself out to the general public as being particularly knowledgeable in trust matters is held to a higher standard than is an individual trustee." *Riggs Nat'l Bank v. Zimmer*, 1977 WL 5316, at *11 (Del. Ch. Nov. 30, 1977).

Delaware's Trust Act permits a trust instrument to modify the duties owed by a trustee and to exculpate a trustee from liability for breaches of duty, subject to a statutory floor. The pertinent provision states:

> Notwithstanding any other provision of this Code or other law, the terms of a governing instrument may expand, restrict, eliminate, or otherwise vary any laws of general application to fiduciaries, trusts, and trust administration, including, but not limited to, any such laws pertaining to:
>
> (1)     The rights and interests of beneficiaries, including, but not limited to, the right to be informed of the beneficiary's interest for a period of time . . . ;
>
> (2)     The grounds for removal of a fiduciary;
>
> (3)     The circumstances, if any, in which the fiduciary must diversify investments;

28

> (4) The manner in which a fiduciary should invest assets . . . ;
>
> (5) A fiduciary's powers, duties, standard of care, rights of indemnification and liability to persons whose interests arise from that instrument; and
>
> (6) The terms of a power of appointment over trust property;
>
> provided, however, that nothing contained in this section shall be construed to permit the exculpation or indemnification of a fiduciary for the fiduciary's own wilful misconduct . . . .

12 *Del. C.* § 3303(a). The statute further provides that "[t]he rule that statutes in derogation of the common law are to be strictly construed shall have no application to this section." *Id.* This provision reflects Delaware's public policy of giving "maximum effect to the principle of freedom of disposition and to the enforceability of governing instruments." *Id.*

Article TENTH(C) of the Trust Agreement limits the scope of potential liability faced by a trustee of the Trust. It provides that "[t]he Trustees shall not be liable for any act or omission in administering any trust herein created; except that each Trustee[] shall be liable for such Trustee's own gross negligence, actual fraud or willful misconduct. No Trustee shall be responsible for any act or omission of any other Trustee." JX 3 at 11 (the "Exculpatory Provision"). In light of the Exculpatory Provision, JP Morgan can be liable only for gross negligence, actual fraud, or willful misconduct. JP Morgan cannot be liable for simple negligence.

When applied to a trustee, gross negligence involves "a higher level of negligence representing an extreme departure from the ordinary standard of care. In other words, a finding of gross negligence requires more than ordinary inadvertence or inattention." *Hardy*, 2014 WL 3736331, at *15 n.119. Gross negligence for a trustee is the functional

29

equivalent of criminal negligence. *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 530 (Del.

1987). By statute, Delaware law defines criminal negligence as follows:

> A person acts with criminal negligence with respect to an element of an offense when the person fails to perceive a risk that the element exists or will result from the conduct. *The risk must be of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.*

11 *Del. C.* § 231(a) (emphasis added). Under this framework, gross negligence "signifies

more than ordinary inadvertence or inattention," but it is "nevertheless a degree of

negligence." *Jardel*, 523 A.2d at 530. Consistent with this interpretation, the Trust Act

distinguishes among mere negligence, gross negligence, recklessness, and intentional

wrongdoing. *See* 12 *Del. C.* § 3301(g).[5]

By the time of post-trial briefing and argument, the Beneficiaries had abandoned

their argument that JP Morgan breached its duty of loyalty. "Issues not briefed are deemed

waived." *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999). Likewise,

> issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. . . . It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work . . . . Judges are not expected to be mindreaders.

---

[5] In the corporate context, by contrast, "gross negligence means reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason." *Tomczak v. Morton Thiokol, Inc.*, 1990 WL 42607, at *12 (Del. Ch. Apr. 5, 1990) (internal quotation marks omitted). "Gross negligence has a stringent meaning under Delaware corporate (and partnership) law, one which involves a devil-may-care attitude or indifference to duty amounting to recklessness." *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *4 (Del. Ch. Aug. 28, 2005) (internal quotation marks omitted). For corporate fiduciaries, gross negligence effectively requires recklessness. *See In re Columbia Pipeline Gp., Inc.*, 2021 WL 772562, at *50 (Del. Ch. Mar. 1, 2021)*, appeal refused,* 2021 WL 1406107 (Del. Apr. 14, 2021) (ORDER).

Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.

*Roca v. E.I. duPont de Nemours & Co., Inc.*, 842 A.2d 1238, 1242 n.12 (Del. 2004) (omission in original) (alteration and internal quotation marks omitted); *accord In re Mobilactive Media, LLC*, 2013 WL 297950, at \*12 n.152 (Del. Ch. Jan. 25, 2013).

The Beneficiaries at most adverted to the duty of loyalty issues in a perfunctory manner. Aside from a short recitation of the legal standard, the sum total of Hadley's arguments on JP Morgan's alleged breach of the duty of loyalty appeared in one short paragraph. Michael's brief offered only a few scattered and incoherent references. These meager allusions were insufficient to establish a breach of the duty of loyalty.

Instead, by the time of post-trial briefing and argument, the Beneficiaries gave pride of place to their arguments that JP Morgan made a series of mistakes when administering the Trust that were so glaring as to rise to the level of gross negligence. The Beneficiaries identified five broad mistakes, but they only argued that two translated into quantifiable monetary damages: JP Morgan's alleged failure to treat the special member interest properly for tax purposes and JP Morgan's selection of the Cash Premium Option rather than a different alternative. The Beneficiaries presumably presented the other issues because when a court considers a trustee's actions, a series of errors or omissions can result in a finding of gross negligence when considered together, even if none alone would meet the test. *Riggs*, 1977 WL 5316, \*16.

JP Morgan proved that it did not act in a grossly negligent fashion, whether the issues are considered individually or in the aggregate. As to most issues, JP Morgan proved

that it did not act negligently at all. In some cases, there might be some room for debate as to how JP Morgan proceeded, but there is no basis to impose liability on JP Morgan.

## A. The Failure To Attend The Surrogate's Court Hearing

According to the Beneficiaries, JP Morgan's original sin involved failing to attend the Surrogate's Court hearing in September 2010.[6] The Beneficiaries' post-trial briefing exaggerates the significance of the rule to show cause and overstates the implications of the hearing. The rule to show cause was simply a notice of the hearing; it did not compel JP Morgan to appear or result in JP Morgan being cited for not appearing. The hearing also did not provide JP Morgan with an opportunity to block the settlement of the Estate Litigation or improve the terms that Hadley accepted under the Estate Settlement Agreement.

---

[6] At times during this litigation, the Beneficiaries have argued that JP Morgan sinned earlier by on-boarding the Trust too hastily. Under this theory, JP Morgan breached its duties by rushing to take over as Trustee without fully understanding the nature of the special member interest because McNeal wanted to curry favor with the Fisher family. It is true that JP Morgan engaged in what was then an unprecedented effort to accept the Trust, without having reviewed the LLC Agreement and without fully understanding the nature of the special member interest. It also is true that JP Morgan acted quickly in part because JP Morgan believed that the Trust would hold ownership interests in the Fisher Brothers real estate empire, worth possibly $100 million, and that serving as trustee could lead to significant additional business. JP Morgan proved, however, that the quick on-boarding of the Trust did not cause any harm to the Beneficiaries. The record also shows that the ultimate source of the pressure was Hadley and his counsel, who wanted JP Morgan to take over as successor trustee as soon as possible. Rather than harming the Beneficiaries, JP Morgan's expectations for the Trust caused JP Morgan to reduce its annual fee for acting as trustee and to accept the successor trustee role without immediately converting the trust into a directed trust. Hadley subsequently refused to go through with the conversion, resulting in the Beneficiaries receiving the benefit of a full trustee relationship at a heavily discounted price.

By the time JP Morgan received notice for the hearing, the terms of the Estate Settlement Agreement had been finalized for months. Hadley had executed the Estate Settlement Agreement with the benefit of advice from personal counsel. Hadley also had executed the RLF Ratification Agreement, in which he ratified the structure of RLF Assets, including the Special Member Buyout. The hearing before the Surrogate's Court did not open the door for JP Morgan to challenge those transactions. The hearing was a routine proceeding to wrap up the outstanding items relating to Richard's estate. *See* JX 36. There was nothing for JP Morgan to do at the hearing, and JP Morgan had a policy of not seeking to review the accountings or acts of prior fiduciaries.

The Beneficiaries argue that JP Morgan at least should have attended the hearing to gather information so that JP Morgan could have evaluated whether to challenge the Estate Settlement Agreement. Contending that JP Morgan should have gathered information to evaluate a potential challenge assumes that a challenge might have been worth pursuing. Under the circumstances, it made no sense for JP Morgan to think that there might be some reason to challenge to the Estate Settlement Agreement. It would have been illogical for JP Morgan to question the very arrangement under which the initial trustees resigned and JP Morgan became successor trustee, particularly when the only vested beneficiary of the Trust—Hadley—had approved the settlement and selected JP Morgan as a result.

The Beneficiaries have not identified any non-speculative benefits that JP Morgan might have generated by attending the hearing. To the contrary, given Hadley's obsession with expenses, he doubtless would have objected if JP Morgan had spent Trust funds to attend the hearing. He likely would have objected vigorously if JP Morgan had spent even

33

more funds to look into the Estate Settlement Agreement that Hadley recently had signed with the assistance of his counsel.

JP Morgan proved that it exercised sound fiduciary judgment by not attending the hearing before the Surrogate's Court. The decision was not grossly negligent and cannot contribute to a finding of liability.

## B.    The Tax Treatment Of The Special Member Interest

Based on the extent to which they address the subject in their post-trial briefs, the Beneficiaries regard JP Morgan's principal error as failing to file tax returns on behalf of the Trust that took issue with the Schedule K-1s issued by RLF Assets. The Schedule K-1s treated RLF Assets as a pass-through entity and attributed a share of RLF Assets' income to the Trust for tax purposes. The Beneficiaries claim that JP Morgan should have filed tax returns which treated the economic features of the special member interest as the equivalent of a testamentary bequest. Under this theory, JP Morgan should have treated both the quarterly distributions that the Trust received and the eventual consideration provided in the Special Member Buyout as a testamentary bequest from Richard's estate. JP Morgan proved that it did not breach its duty of care by failing to adopt this tax position.

As a threshold matter, a trustee can breach its duty of care by failing to adopt a legitimate tax position that would result in material tax savings for the trust. *See Riggs*, 1977 WL 5316, at *2. At the same time, a trustee can fulfill its duty of care by retaining and relying on an individual with expertise in the area of taxes, so long as the trustee uses reasonable care in selecting the expert. *Id.* at *15. The tax expert need not be an outside professional retained for that purpose; in *Riggs*, the trustee fulfilled its duty of care by

34

relying on the expertise of its co-trustees. *Id.* Under the Exculpatory Provision, JP Morgan can face liability only if the failure to adopt the tax position constituted gross negligence.

JP Morgan proved that it did not act in a grossly negligent manner when filing the Trust's tax returns. After becoming successor trustee, JP Morgan met with Ditman, who prepared the tax returns for RLF Assets and for the members of the Fisher family generally. JP Morgan decided to allow Ditman to continue to prepare the Trust's tax returns, in part because he already was preparing the tax returns for RLF Assets and Hadley. The interrelationships among the various returns meant that it was efficient for Ditman to prepare them. JP Morgan did not act in a grossly negligent manner when making this decision.

Later, JP Morgan consolidated all of its tax work under Deloitte. JP Morgan oversaw Deloitte's efforts and even caught an error in one of Deloitte's filings. *See* King Tr. 352; JX 79. Once again, JP Morgan did not act in a grossly negligent fashion.

In 2015, JP Morgan considered whether pass-through tax treatment was correct. Although the record is relatively sparse, it shows that JP Morgan discussed the issue internally and reviewed past tax returns.

JP Morgan did not breach any duty by accepting Ditman's treatment of RLF Assets as a pass-through entity for tax purposes. The LLC Agreement contemplated in multiple sections that RLF Assets would be taxed as a partnership, and it included references to specific sections of the Internal Revenue Code that govern partnership taxation. *See, e.g.*, JX 4 §§ 5.4, 7.3, 7.4; *see also* DiMichael Tr. 484–88. Ditman accordingly treated RLF Assets as a partnership for tax purposes and prepared Schedule K-1s for its members. First

Ditman and later Deloitte used the Schedule K-1s to prepare the Trust's tax returns. The Beneficiaries' tax expert agreed that partnership treatment was a viable approach. DiMichael Tr. 484–85. He declined to opine that Ditman and Deloitte acted improperly by applying this tax treatment. *Id.* at 485–86.

The Beneficiaries attempted to call JP Morgan's actions into question by pointing out that the special member interest received annual distributions from RLF Assets that were fixed between $600,000 and $1,200,000, and that the Special Member Buyout was designed to deliver a fixed sum of $10,000,000 to the Trust after ten years. They also point out that the LLC Agreement stated that each special member interest had a 0% equity interest in RLF Assets. The Beneficiaries correctly observe that that the economic substance of the special member interest was quite different from a proportionate share of profits and losses. The Beneficiaries also point out that because JP Morgan accepted pass-through tax treatment, the income attributed to the Trust for tax purposes fluctuated widely.

Based on these facts, the Beneficiaries argue that JP Morgan should have taken the position that the annual distributions to the Trust and the consideration eventually received through the Special Member Buyout effectively were testamentary gifts. The Beneficiaries contend that this tax treatment would have resulted in higher taxes for Richard's estate and also would have resulted in Winston bearing 100% of the tax implications for the operations of RLF Assets. The Trust, by contrast, would have avoided taxes on the annual distributions and on the proceeds from the Special Member Buyout because those amounts would be treated as testamentary gifts.

The Beneficiaries' tax position is creative, and it more accurately reflects the economic substance of the special member interest. That said, it is an innovative theory that currently fails to find support in tax court precedent or in an extant IRS interpretation of the tax code or regulations. Zeydel was an expert in trust and estates law who had represented Hadley since the early years of the Estate Litigation. She focused consistently on minimizing Hadley's taxes, yet she never suggested the testamentary approach. Borowsky has an LLM in taxation, advised JP Morgan on the Special Member Buyout, and also was focused on minimizing Hadley's taxes. She did not think of the possibility either.

JP Morgan proved that it was not grossly negligent in failing to pursue an innovative and untested theory. JP Morgan acted properly by filing the returns that Ditman and later Deloitte prepared.

## C. The Acceptance Of The Cash Premium Option

In their other significant claim, the Beneficiaries maintain that JP Morgan acted in a grossly negligent fashion by accepting the Cash Premium Option. JP Morgan demonstrated that the decision to accept the Cash Premium Option was not grossly negligent.

JP Morgan acted prudently when determining how to respond to the Special Member Buyout. JP Morgan relied on Borowsky, an attorney that JP Morgan selected with reasonable care and who JP Morgan reasonably (and correctly) believed had the professional and expert competence to provide advice on the issues that JP Morgan faced. *See Riggs*, 1977 WL 5316, at \*15. Borowsky analyzed JP Morgan's options, negotiated

with Winston's counsel, and advised JP Morgan on the various proposals. Borowsky ultimately advised JP Morgan to accept the Cash Premium Option.

Rather than suggesting any type of fiduciary breach, JP Morgan's response to the exercise of the Special Member Buyout evidences diligence and care. Immediately after learning that Winston was exercising the Special Member Buyout, King assembled a team of professionals that included internal staff (Torino, Baker, Yulsman, Kim, Conway, and Patel) and external advisors, including Borowsky and other attorneys from Duane Morris.

The team evaluated potential strategies for blocking, delaying, or challenging the Special Member Buyout. As part of this process, Borowsky advised that the Trust had no viable claims against Winston for self-dealing. *See* Borowsky Tr. 379–80; JX 98. In forming her views, Borowsky considered a range of factors, including:

- Article NINTH of the Trust Agreement, which authorized the trustees to exercise their powers "even though any Trustees [sic] is personally interested in the property that is involved, notwithstanding any rules of law relating to divided loyalty or self-dealing." JX 3 at 10.

- Hadley's execution of the Estate Settlement Agreement, at a time when he was represented by counsel.

- The terms of the Estate Settlement Agreement, in which Hadley (i) agreed that he would not challenge the settlement, its components, or a series of related documents, including the LLC Agreement, in any capacity, directly or indirectly; (ii) released all claims on behalf of himself and his heirs, successors, and assigns, in any capacity, that related to the estate and its settlement; (iii) granted all parties a covenant not to sue for all claims related to the estate and its settlement, except claims to enforce the Estate Settlement Agreement itself; (iv) waived the ability to assert any claims discovered after executing the agreement; and (v) specifically agreed that the Estate Settlement Agreement was binding on his "agents, representatives, heirs, successors, assigns, executors, [and] trustees." JX 13 ¶¶ 6, 38–40, 51.

- Hadley's execution of the RLF Ratification Agreement, at a time when he was represented by counsel.

- The terms of the RLF Ratification Agreement, in which Hadley (i) ratified and confirmed that the LLC Agreement was in full force and effect and (ii) agreed that his execution of the RLF Ratification Agreement was binding on himself and his heirs. JX 12 ¶¶ K, R.

Borowsky believed that the Trust would not succeed in challenging the Special Member Buyout, that the litigation would consume the Trust's resources in a futile effort, that Winston would seek to enforce the terms of the Special Member Buyout as written, and that Winston would prevail. Borowsky had ample basis for reaching her conclusions, even if one might debate isolated aspects of her analysis.

The JP Morgan team prioritized mitigating the adverse tax consequences of the Special Member Buyout. JP Morgan's efforts resulted in Winston providing three alternatives: the Real Estate Option, the Securities Pool Option, and the Cash Premium Option. With the assistance of its outside advisors and the benefit of internal resources, JP Morgan analyzed each alternative.

- The Real Estate Option contemplated the Trust receiving an interest in a special purpose vehicle that would own interests in real estate. Winston would control the vehicle, and although the Trust would gain control over time, the vehicle would continue to own legacy investments that Winston made. The Trust's right to distributions from RLF Assets would fall to $300,000, and beginning in June 2018, RLF Assets no longer would make distributions to the Trust. In theory, the Trust would receive distributions from the special purpose vehicle, but those distributions were not guaranteed and would be supported by a smaller asset base. The main attraction of the Real Estate Option was to defer capital gains taxes indefinitely, at least until the various real estate interests were sold.

- The Securities Pool Option also involved a special purpose vehicle that Winston would control. The principal difference was that instead of investing only in real estate, the vehicle would invest in a broader range of investments. Winston also agreed to guarantee a minimum distribution of $300,000 per year, with additional distributions of up to $600,000 dependent on the income generated by the securities pool. JP Morgan would not have any visibility into or control over the investments. Most significantly, the Trust still would face the possibility of a buyout in 2021 or

39

2026. The main attraction of the Securities Pool Option was to defer taxes until the buyout took place, but there was no guarantee that the Trust's tax position would be better in 2021 or 2026.

- The Cash Premium Option partially mitigated the tax consequences of the buyout through increased proceeds. It gave the Trust control over the corpus, and it allowed Hadley and the Trust to cut ties with Winston. JP Morgan believed that by investing the proceeds from the Cash Premium Option, JP Morgan could generate annual distributions similar to the minimum guarantee under the Securities Pool Option and without any cap on the potential upside.

Based on Borowsky's advice, JP Morgan concluded that the Cash Premium Option was the best alternative. JP Morgan proved that its decision was not grossly negligent. Indeed, JP Morgan argued persuasively that it made the best possible decision.

### D. Declining To Arbitrate

The Beneficiaries argue that JP Morgan acted in a grossly negligent fashion by not commencing an arbitration against Winston during the negotiations of the Special Member Buyout to call Winston's bluff and extract a higher offer. The Beneficiaries maintain that JP Morgan should have asserted a claim that challenged the execution of the LLC Agreement as an interested transaction. JP Morgan did not breach its fiduciary duties by declining to pursue an arbitration against Winston.

JP Morgan decided not to arbitrate after Borowsky advised JP Morgan of her view that the Trust lacked any reasonable grounds to oppose the Special Member Buyout, that an arbitration was unlikely to succeed, and that an arbitrator likely would enforce ethe terms of the Special Member Buyout as written. Borowsky Tr. 401. Borowsky believed that pursing the arbitration would waste the Trust's assets while risking the loss of the Cash Premium Option, resulting in the Beneficiaries being far worse off.

As noted previously, JP Morgan exercised reasonable care in selecting Borowsky as its counsel, and JP Morgan reasonably and correctly viewed these matters as falling within Borowsky's expertise. JP Morgan was entitled to rely on her advice. Here again, JP Morgan demonstrated that its decision was not grossly negligent. Here too, JP Morgan argued persuasively that it made the best possible decision.

## E.      Filing This Litigation

The Beneficiaries finally argue that JP Morgan acted in a grossly negligent manner by filing this litigation. The Beneficiaries claim that instead of pursuing after-the-fact litigation, JP Morgan should have petitioned the court for instructions regarding the Special Member Buyout. JP Morgan proved that it did not breach its duties by not filing a petition for instructions and later filing this litigation.

### 1.      Not Filing A Petition For Instructions

JP Morgan acted properly by not filing a petition for instructions. For starters, such a petition would not have changed the outcome. JP Morgan proved that it made the best possible decision in selecting the Cash Premium Option. If JP Morgan had sought instructions, then the court would have directed JP Morgan to do what it did.

More importantly, JP Morgan was not faced with an issue that was suitable for instructions. JP Morgan did not confront a disputed question of law, such as a debate over the proper interpretation of the plain language of a trust agreement. JP Morgan faced a discretionary decision about what was in the best interests of the Trust. When a settlor creates a trust and empowers a trustee with decision-making authority, the trustee is the proper party to make the decision. That allocation of authority fulfills the settlor's intent.

41

It also likely reduces the risk of error, because the trustee will have developed familiarity with the trust over time and thus have a comparative advantage over other potential decisionmakers, such as a court. A trustee should not attempt to shirk its responsibility to make a difficult decision by filing a petition for instructions and lateraling its job to a judge. A court may review a trustee's decision after the fact to determine if it complied with applicable standards of fiduciary duty and the terms of the trust agreement, but it is the trustee's obligation to make the decision.

King and Borowsky correctly understood this dynamic. King considered filing a petition for instructions, but Borowsky wisely discouraged that course of action, and King decided against it. *See* Borowsky Tr. 402–03, 446.

In this case, a petition for instructions also carried unacceptable risk for the Trust. The filing of a petition for instructions does not result in the court immediately dispensing an answer from on high. A petition for instructions starts a litigated proceeding. Where the answer turns on a contested factual record, as any petition in this case would have, then the litigation involves discovery, a trial, and the prospect of an appeal. Winston had no obligation to await the outcome of what could have been a multi-year process. He could have caused RLF Assets to enforce its rights under the Special Member Buyout. If JP Morgan had filed a petition for instructions, then the most likely outcome would have been for Winston to (i) withdraw the three alternatives to the Special Member Buyout, including the Cash Premium Option and (ii) commence an arbitration against the Trust to enforce the Special Member Buyout according to its terms. Filing a petition for instructions could well

have caused the Trust to face two expensive legal proceedings, rather than one, and it would have jeopardized the incremental $1.5 million premium that JP Morgan secured.

JP Morgan was not grossly negligent in declining to file a petition for instructions. JP Morgan proved that it made the correct decision under the circumstances.

### 2. Filing This Litigation

Borowsky likewise advised JP Morgan to file this suit after accepting the Special Member Buyout. While the negotiations progressed, Hadley became increasingly frustrated and confrontational. In late August 2016, Greenberg Traurig withdrew from the negotiations, which suggested to JP Morgan that Greenberg Traurig might be protecting its ability to represent Hadley in litigation over the Special Member Buyout. *See* JX 102. JP Morgan also learned that Hadley had hired a litigator based in New York and believed that Hadley potentially was planning to file a lawsuit in New York. *See* King Tr. 326–27; Borowsky Tr. 403–04. Based on these events, Borowsky advised JP Morgan to file this action in Delaware after accepting the Cash Premium Option. Borowsky Tr. 403–05.

Reasonable minds could debate whether filing preemptive litigation was the optimal strategy. Regardless, JP Morgan was entitled to rely on Borowsky's advice in deciding what action to take. The decision was not grossly negligent.

**F. Legal Expenses**

The final issue is the allocation of legal expenses.[7] JP Morgan seeks to have the Trust pay its legal expenses. The Beneficiaries oppose that relief and seek to have JP Morgan pay their legal expenses. Both sides rely on Section 3584 of the Trust Act, which states: "In a judicial proceeding involving a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorneys' fees, to any party, to be paid by another party or from the trust that is the subject of the controversy." 12 *Del. C.* § 3584.

When a party seeks to have a trust bear its legal expenses under Section 3584, the court evaluates the party's motives for pursuing the litigation and the benefit, if any, that the litigation conferred on the trust. *In re Unfunded Ins. Tr. Agreement of Capaldi*, 870 A.2d 493, 498 (Del. 2005). The fact that a party may commence litigation for self-interested reasons does not preclude an award of legal expenses if the litigation benefited the trust and the award would be just and equitable. *Id.* Under both Section 3584 and the common law, a trustee is entitled to have its legal expenses paid by the trust if the legal expenses "were necessary for the proper administration of the trust" or "otherwise resulted

---

[7] This decision uses the term "legal expenses" to refer collectively both to attorneys' fees and out of pocket costs that might be referred to more traditionally and colloquially as expenses. For this purpose, the scope of out-of-pocket costs encompasses third-party expenses generally associated with the litigation. It is thus broader than the restricted concept of "costs" that a prevailing party can recover by statute. *See* 10 *Del. C.* § 5106; *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 686–88 (Del. 2013).

in a benefit to the trust." *Bankers Tr. Co. v. Duffy*, 295 A.2d 725, 726 (Del. 1972). The

"usual rule" is that a trustee who successfully defends litigation against the trust is "entitled

to look to the trust for reimbursement of that expense." *Capaldi*, 870 A.2d at 496 (internal

quotation marks omitted); *accord In re Nancy W. Couch Tr.*, 723 A.2d 376, 384–85 (Del.

Ch. 1998) (approving trust's payment of trustee's legal expenses where trustee

"successfully defended against the petitioner's attacks on its administration of the trust as

well as her attempt to remove it as trustee"). By contrast, a trust should not have to bear

the legal expenses of a trustee who initiates litigation "to insulate itself from possible

surcharges" or out of a "desire to receive absolution" for its conduct. *Bankers Tr.*, 295 A.2d

at 726. A court may always deny an award, wholly or in part, if the trustee has acted in bad

faith, fraudulently, or engaged in other wrongful conduct. *See McNeil v. McNeil*, 798 A.2d

503, 514 (Del. 2002).

Contrary to JP Morgan's assertion, Section 3584 does not require a showing of bad

faith sufficient to warrant shifting expenses under the American Rule.[8] Section 3584

---

[8] In making this argument, JP Morgan mischaracterizes three precedents to an unpalatable degree. Dkt. 180 at 57–58 (citing *In re Hawk Mountain Tr. Dated Dec. 12, 2002*, 2015 WL 5243328 (Del. Ch. Sept. 8, 2015); *In re IMO Tr. for Grandchildren of Gore*, 2013 WL 771900 (Del. Ch. Feb. 27, 2013); and *Copeland v. Kramarck*, 2006 WL 3740617 (Del. Ch. Dec. 11, 2006)). In *Hawk Mountain*, Vice Chancellor Parsons stated plainly, "I do not understand 12 *Del. C.* § 3584 to require a showing of bad faith as generally would be necessary under the American Rule." 2015 WL 5243328, at *6. In *Gore*, as discussed in the above-the-line text, the court explained that Section 3584 provides additional authority to shift fees beyond what the bad-faith exception permits. 2013 WL 771900, at *2. And in *Copeland*, the petitioners moved for expense-shifting on multiple grounds, including the bad-faith exception to the American Rule. 2006 WL 3740617, at *3. The reference to bad faith appears in that discussion. *See id.* When

45

"supplements the Court's inherent authority under the American Rule to award fees as a consequence of bad faith conduct either preceding the action or during the action." *Gore*, 2013 WL 771900, at *2. In other words, it adds to the court's existing common law authority to shift expenses under the bad-faith exception to the American Rule by providing an additional, statutory basis that requires a lesser showing. *Id.* If Section 3584 only authorized the shifting of legal expenses under the circumstances contemplated by the bad-faith exception to the American Rule, then the statute would be rendered surplusage. *Cf. Bragdon v. Bayshore Prop. Owners Ass'n, Inc.*, 2021 WL 922130, at *19 (Del. Ch. Mar. 11, 2021). A showing of bad faith that would satisfy the American Rule thus will warrant fee shifting under Section 3584, but a party's conduct need not rise to that level before principles of justice and equity may warrant an award.

Whether to order the Trust to reimburse JP Morgan for its legal expenses presents a close call. JP Morgan filed this action preemptively "to insulate itself from possible surcharges" and out of a "desire to receive absolution" for its conduct. *Bankers Tr.*, 295 A.2d at 726. In its complaint, JP Morgan sought a broad declaration that it had acted properly in all respects since taking over as trustee in 2010. Further evidencing JP Morgan's desire to receive blanket absolution, JP Morgan previously had declined to resign as trustee unless Hadley provided JP Morgan with an all-encompassing release. Along

---

discussing Section 3584, the court stressed that the standard is what "justice and equity may require." *Id.* at 4. It would have been better for JP Morgan not to make this argument.

46

similar lines, JP Morgan offered to arbitrate against Winston, but only if Hadley provided JP Morgan with an all-encompassing release.[9]

There also is some reason to think that if JP Morgan had not filed this preemptive action, then litigation might never have ensued. Hadley had become frustrated and threatened litigation, but he was not a litigious person and lacked any demonstrated history of filing lawsuits. Hadley was represented by counsel in the Estate Litigation, but he seems to have stayed largely on the sidelines. Hadley had criticized JP Morgan regularly over the years, but he had never taken any steps towards a lawsuit. By filing this litigation preemptively, JP Morgan forced Hadley to put up or shut up, particularly as to the rights of his minor son. And just as JP Morgan's demands for a release had raised Hadley's suspicion, its filing of this lawsuit prompted justified anger at a firm that he believed had been obligated to protect his interests. Those concerns became heightened over the course of the litigation, as JP Morgan took hardline positions and resisted legitimate discovery requests.

On balance, justice and equity require that JP Morgan bear its own legal expenses. JP Morgan sought absolution, and this litigation did not confer any benefits on the Trust.

---

[9] Although the practice of demanding a release is widespread, a trustee who insists on a release as the price doing what is in the best interests of the trust—and what the trustee's fiduciary duties therefore require—engages in self-interested conduct by extracting a personal benefit at the expense of the trust and its beneficiaries. The trustee's insistence on a release also may fuel the beneficiaries' concern about improper conduct, as it did in this case. It seems likely that if JP Morgan had not demanded a release when JP Morgan wanted to resign in 2014, then another trustee could have taken over the administration of the Trust, and this litigation might never have happened.

This decision has found that JP Morgan did not breach it fiduciary duties, but some of JP Morgan's actions were the subject of legitimate inquiry, particularly during the period when McNeal was trying to expand his relationship with the Fisher family. JP Morgan ultimately dispersed the smoke and proved there was no fire, but JP Morgan helped create the messy situation. The Trust and the Beneficiaries should not have to shoulder the legal expenses that JP Morgan incurred to straighten it out.

Justice and equity also require that the Hadley bear his own legal expenses. Like JP Morgan, Hadley bears a meaningful share of responsibility for the fact that the case had to be litigated. After JP Morgan filed suit, Hadley used the case to air his grievances over the Estate Settlement Agreement. Even though Hadley entered into the Estate Settlement Agreement and related RLF Ratification Agreement with the advice of counsel, Hadley tried to blame JP Morgan in this litigation for not taking action to challenge the resulting structure. Hadley thus expanded this litigation considerably. JP Morgan litigated vigorously, but not in a manner that would warrant causing it to bear Hadley's expense.

Justice and equity finally require that JP Morgan and the Trust jointly reimburse Michael for his legal expenses. Unlike JP Morgan and Hadley, Michael bears no share of the responsibility for the fact that the case had to be litigated. By seeking broad absolution from any liability for failure to discharge its duties to Michael, JP Morgan forced Michael's guardian *ad litem* to investigate all of JP Morgan's conduct or lose any ability to recover from JP Morgan. The resulting situation is one in which this court may, "in its discretion, assess counsel fees 'where equity requires.'" *Scion Breckenridge,* 68 A.3d at 687 (quoting *Burge v. Fidelity Bond & Mortg. Co.*, 648 A.2d 414, 421 (Del. 1994)). However, JP

Morgan does not bear all of the responsibility for the wide-ranging scope of the litigation. Hadley also contributed. The equitable outcome is for JP Morgan to reimburse Michael for one half of his legal expenses. Although the parties have not raised the issue, the Trust is the logical source of reimbursement for the remainder of Michael's expenses.

### III. CONCLUSION

JP Morgan did not breach its fiduciary duties. JP Morgan and Hadley must bear their own legal expenses. JP Morgan will reimburse Michael for half of his legal expenses. JP Morgan is entitled to court costs as a prevailing party. The parties will confer and submit a form of order so that final judgment can be entered.